LILLIAN P. MATTHEWS, Plaintiff and Counterdefendant-Appellant, v.
ROBERT K. MATTHEWS, Defendant and Counterplaintiff-Appellee.

Second District (2nd Division) No. 74-300

Opinion filed March 17, 1976.

Timothy Reuland, of Reid, Ochsenschlager, Murphy & Hupp, of Aurora,
for appellant.

Burek & Field, of Wheaton, for appellee.

Mr. JUSTICE DIXON delivered the opinion of the court:

A complaint for separate maintenance was filed by Lillian P. Matthews
against Robert K. Matthews, her husband, in the Circuit Court of
Du Page County, Illinois. The husband filed a counterclaim for a divorce
on the ground of mental cruelty. The trial court, by decree of divorce
entered May 20, 1974, found the issues in favor of the husband, granted

the husband a divorce for mental cruelty, and ordered the parties' home sold and the proceeds divided unequally so as to provide $4,000 as alimony in gross for the wife. The trial court also, by order entered May 28, 1974, denied the wife's post-decree petition for alimony, attorneys' fees, and costs pending appeal. The wife has appealed.

The parties were married October 22, 1963. No children were born of the marriage, although one of the wife's daughters by a previous marriage lived with them until 1970. The wife had no funds of her own and there is no evidence that the husband had any substantial savings when the parties were married. The husband then was chief investigator for the Du Page County State's Attorney's office. His hours at that time were irregular; his duties included evening work, day work, and on-call work.

In 1971 the husband was appointed to the office of coroner of Du Page County, a position which also involved irregular working hours. In 1972, despite criticisms concerning his lack of a medical background, he won election for a 4-year term as coroner. He worked very diligently at his job. Calls came to him at all hours of the day and night, 7 days a week, and he responded to the calls. Being compelled to go out on coroner's business at all hours, he was away from home most nights, and was frequently gone until 4, 5, or 6 o'clock in the morning.

In 1967 or 1968 the husband learned that he was a diabetic. In 1971 he learned that he also had prostate trouble. His prostate gland was removed in early August, 1973. In the 2½ years preceding the separation of the parties on September 18, 1973, the husband and the wife did not have marital relations. They discussed his condition quite often and she pressed him to resume marital relations, but he did not comply.

The wife also had health problems. In 1969 she was under a doctor's care for ulcers. In 1970 she fell on ice and afterwards had persistent trouble with a neck injury she then received. She also had trouble with double vision and temporary loss of vision in one eye. In May of 1973 she had two operations on diseased carotid arteries. On July 29, 1973, she had an acute heart attack and was hospitalized until August 24 or 25, 1973. She was diagnosed as having angina pectoris, cerebral vascular insufficiency, arteriosclerosis, arthritis in her neck, and diabetes. When the husband had his prostate operation and the wife her heart attack, both of them were in the hospital at the same time.

Because of her ill health the wife's ability to do housework was restricted, but the husband would not help with work around the house. He did, however, provide the services of a housekeeper and a chore boy. He continued to be away from home as much as ever, and, the wife testified, he never told her where he had been. She would sometimes try

to get in touch with him, when she was experiencing chest pains, and would be unable to reach him when she called the place where he had said he was going. She was kept awake at night by the mechanical whirring sound of the answering service she turned on so she would not have to take the husband's phone calls. On one occasion she spoke to him about her distress when she could not reach him and about the chest pains she would get, she testified, and he just shrugged his shoulders. On another occasion she asked him not to quarrel because she had just taken some extra tranquilizers, and he said he didn't care whether she had taken the whole bottle. To the wife he appeared cold and inconsiderate; he did not converse as much as she would have liked; he read during meals; and he talked less and less about his work as coroner. Except for the period immediately following the wife's hospitalization for her heart attack, the husband did not give the wife the comfort and reassurance she wanted about her health and progress.

Money difficulties also concerned the husband and the wife. They discussed the bills that were coming in from the doctors and the hospital. They also talked about saving money. The husband from time to time requested that they try to save some money, saying that when they got older they were going to need it. On September 14, 1973, the husband told the wife that he was going to take over the payment of the bills and would give her a separate account for household expenses. She responded, he testified, by saying that they would see who gets the money. She did, however, turn over the checkbook and credit cards to the husband. This episode was the only cause he knew for the wife's leaving him on September 18, 1973, the husband said. He stated that he had been generous to her children, had visited her frequently when she was in the hospital, and had not refused her anything, and that she had not complained to him about chest pains or argued with him about his late hours. The wife, on the other hand, testified that the husband's taking over the checkbook and charge accounts had nothing to do with her leaving him; that she left because her doctor had suggested it.

The wife's doctor testified that after her heart attack the wife was suffering from a large amount of anxiety, that he had got the impression that her husband caused her a great deal of anxiety, and that he therefore had advised a separation. He admitted that the wife was also frustrated by his orders that she minimize her activity; that factors other than marital difficulties could cause her to experience chest discomfort and heart pain; and that he did not think the husband had had anything to do with her vascular deterioration. The wife testified that her doctor had suggested that she stay away for a few weeks to see whether

she made any improvement. The doctor's testimony indicates that there was no improvement.

After the separation of the parties, the fact of the separation became common knowledge. The husband testified: "I have continued in politics since her leaving in connection with my official duties. The general public knows she has left me. I have been confronted with that fact numerous times. It is rather embarrassing."

■■ We have carefully reviewed the testimony to determine whether there is sufficient evidence of mental cruelty to support the decree of divorce given to the husband. Conduct to be considered extreme and repeated mental cruelty must be an unprovoked course of abusive and humiliating treatment making the other spouse's life miserable or endangering the life or health of the other spouse. (*Rey v. Rey*, 23 Ill. App. 3d 274, 275; *Stanard v. Stanard*, 108 Ill. App. 2d 240, 249.) We cannot find, in all the testimony relating the difficulties and differences of the parties, any evidence that the wife was engaging in a course of abusive treatment of her husband. Nor can we find that the husband's life was thereby made miserable, his professing to be somewhat embarrassed over her departure being clearly insufficient. (*Gregory v. Gregory*, 24 Ill. App. 3d 436, 441.) Even though a marriage may have deteriorated to the point when a reconciliation seems to be no longer possible (*Sharpe v. Sharpe*, 9 Ill. App. 3d 667, 670) and the marriage appears dead (*Lowrance v. Lowrance*, 31 Ill. App. 3d 682), yet it cannot be terminated by a court without sufficient proof of fault as outlined by the legislature. It is our conclusion that there is not sufficient evidence of extreme and repeated mental cruelty to support the decree of divorce entered in this case in favor of the husband.

■■ We have also sought to determine from the testimony whether separate maintenance should have been granted to the wife. For the plaintiff to be entitled to a decree of separate maintenance it must be established that the parties are living apart without the plaintiff's fault, this requiring proof that the plaintiff did not engage in a course of conduct that materially contributed to the breakdown of the marriage relationship, and that the separation was not simply a voluntary arrangement of the parties but was compelled, because the defendant's conduct was such as to endanger the plaintiff's life or health, or because the defendant pursued a persistent, unjustifiable, and wrongful course of conduct rendering the plaintiff's life miserable and living with the plaintiff unendurable. (*Abraham v. Abraham*, 403 Ill. 312, 313-14; *Holmstedt v. Holmstedt*, 383 Ill. 290, 298; *Johnson v. Johnson*, 125 Ill. 510, 514-15.) It does not appear in this case that the husband's late hours or behavior endangered the wife's health or life, because she did not improve after

leaving him. It does not appear that the husband's inability to copulate was his fault, or worsened her state of nervousness, or required or called for a separation. It does not appear that the husband's diminishing interest in conversing with the wife and sympathizing with her over her health problems could be considered unjustifiable and wrongful conduct, in view of his own health problems and money worries, or could reasonably be said to make living with him unendurable. On the last point what was stated in an early case may be equally appropriate here: "We are unwilling to say that because the husband becomes disagreeable by reason of sickness which he can not control, that his wife may make that a cause for leaving him, and then say that she is living separate and apart from her husband without her fault, and thereby obtain a decree of the court for a separate maintenance. She may deny to her husband the marital rights and leave his domicile for such reasons as appear from the evidence in this case if she will, for it is not the province of a court of justice to advise; but that for such cause she may have the decree of a court of equity for a separate maintenance and the power of the court to enforce it, we think was not intended by the legislature in the enactment of the statute in such cases." *Orendorff v. Orendorff,* 91 Ill. App. 61, 63.

The plaintiff maintains that the trial court erred in denying her motion for prospective attorneys' fees and expenses to permit her to prosecute this appeal, but her argument we believe to be without merit. A prospective allowance of fees and expenses, it has been held, may be granted for the defense of an appeal but not for the prosecution of an appeal. *Buehler v. Buehler,* 373 Ill. 626, 628; *Hall v. Hall,* 25 Ill. App. 3d 524, 528-29; see *Bramson v. Bramson,* 17 Ill. App. 2d 87, 97-98.

For the reasons stated, the decree of divorce entered by the Circuit Court of Du Page County is reversed, and the orders denying separate maintenance; alimony, fees, and costs pending appeal are affirmed.

Decree for divorce reversed, orders affirmed.

T. J. MORAN, P. J., and HALLETT, J., concur.