ALLAN VOSS, Plaintiff-Appellee, *v.* ALICE LOUISE VOSS, Defendant-Appellant.

Second District   No. 76-451

Opinion filed December 19, 1977.—Rehearing denied January 20, 1978.

Sanford Kirsh, of Kirsh, Nadler & Berman, of Chicago, for appellant.

Bernard Hammer, of Chicago, for appellee.

Mr. PRESIDING JUSTICE RECHENMACHER delivered the opinion of the court:

The defendant and appellant here (hereinafter referred to as the "wife"), appeals from a decree of the circuit court granting the husband a divorce on grounds of mental cruelty; dismissing the wife's counterclaim for separate maintenance, and apportioning the marital property between the parties, subject to certain credits in favor of the husband.

We find it necessary to set out the facts as developed by the testimony at length in order to clearly indicate the reasons we believe the trial court's judgment must be reversed.

The couple were married in 1965. They were middle aged and had apparently both been married and divorced previously; there were no children born of the marriage. At the time of the marriage both of them were working and they continued to work and pooled their money. The husband owned a condominium in Chicago, previous to the marriage, which it appears the couple occupied prior to the marriage. The original condominium in Chicago was in the husband's name, although there is testimony that their income was pooled while they were living together, prior to the marriage. In 1972, the husband sold the Chicago condominium and the couple purchased a condominium in the Village of Wooddale, title to which was taken in joint tenancy. According to the testimony at trial, the wife contributed several thousand dollars to the downpayment on the new condominium and the net proceeds of the Chicago condominium sale were applied to the rest of the downpayment.

One of the exhibits of record shows the wife executed the joint note for $6,399.47 which represented the downpayment for the condominium. The wife testified she contributed from her earnings both to the downpayment and through their joint savings account to the subsequent monthly payments. Since the wife's W-2 form showed she had earnings from outside employment in 1971 of over $7,000 and earnings and commissions of about $3,700 in 1972, and her uncontradicted testimony was that she put all her earnings in the joint account, we can reasonably assume that some contribution was made by the wife to the purchase of the Wooddale condominium.

In 1969, the wife, while employed in a factory doing inspection work, also entered into a sideline operation which was a franchise to represent a cosmetic firm, doing business as Holiday Magic. The husband testified he gave the wife $5,000 to buy the franchise, but there was also testimony that $2,500 of this was borrowed from the husband's brother and had later been paid back to him, presumably out of the joint marital funds. In any event, the business was not a success and after operating it for two or three years, the wife gave it up and gave the remaining cosmetics and stock to a friend. The loss, however, was taken as a deduction from their joint income tax return.

After Holiday Magic failed, the wife, in 1973, started an operation called Mind Dynamics, which was not a financial success, either, losing $1,081 in 1973. Again, the loss was taken as a deduction on their 1974 joint income tax return. There was some brief testimony about a later operation called Horizons of Awareness, which the 1974 joint income tax return of the parties indicates lost $698, a loss again taken credit for on the parties' joint income tax return. During the period of 1969 through 1974, the wife had wages from outside employment amounting to between $25,000 and $30,000, very greatly in excess of the losses from her sideline businesses, indicated above. The wife testified the earnings from her outside employment were deposited in the couple's joint banking account.

During the whole period of the marriage the husband was employed as a buyer by Goldblatt Department Stores, at a salary ranging from $16,000 to over $20,000 annually.

The husband alleged that he had been forced to borrow money from his mother because of his wife's unfortunate business ventures which, he claimed, had drained him financially and had eventually caused him to become ill.

The net result of the rather voluminous testimony about finances, as we read it, is to completely dispel the husband's contention that he was put under an intolerable strain by his wife's "hare-brained" business

ventures. The plain fact, sofar as the record shows, is that from 1969 through 1974, the wife earned from outside employment much more than the losses from her business ventures. In addition, the business losses were offset against the parties' joint tax returns. The husband thus took advantage of the losses he now complains of. In any event, the losses noted above, obviously, were not sufficiently serious to induce the emotional trauma the husband now claims here as a basis of mental cruelty.

Moreover, it is quite irrelevant as a ground for divorce that the defendant spouse attempted two or three business ventures which were financially unsuccessful, where the complaining spouse was at all times aware of the details of such businesses and from time to time accepted certain receipts from such businesses, as well as accepting the losses on the joint income tax returns. The exhibits of record, for example, include checks made payable to and endorsed and deposited by Allan Voss, the husband, from the business, Mind Dynamics, as follows:

| 1972 | $1,200.00 |
| 1973 | 900.00 |
| 1974 | 1,445.00 |

■■ Nor can we overlook the established fact that in 1974, which was really the last year of the marriage, the husband gave the wife a 1974 Montego Mercury automobile as a gift and bought a 1974 Lincoln Continental automobile for himself, which he went into debt to pay for. He also borrowed money from his mother and used $400 of this amount to pay for a hair piece (toupee). It is hardly comprehensible to us how the husband's desperate financial straits—if he was in such straits—can be blamed on the wife's business ventures in the face of the facts established above. We must consider, therefore, on the basis of the record before us, that the unfortunate business ventures of the wife did not establish a pattern of mental cruelty.

■■ The preponderance of the evidence indicates, in our opinion, that the marriage was stable, happy and relatively uneventful until just prior to the wife's leaving for California, after all plans for the trip had been mutually agreed upon. The husband alleges in the complaint that the wife took a three-week vacation in California, against his wishes. This charge seems to be contradicted by the testimony of record and in any case the issue is irrelevant as a ground for divorce. The testimony clearly indicated that he did not oppose the vacation until the last minute, when after allowing the airplane ticket to be charged to his own account at his suggestion, he declared he would not pay for it. The undisputed testimony of his wife's daughter (by a previous marriage) was that she was invited by the husband to accompany her mother on the trip, and

when she indicated she could not go, he suggested that her son (his step-grandson) accompany his wife at his expense.

■■ The husband also alleged that his wife, in an argument the night he left her, struck him with a frying pan, but he admitted that during the altercation he "used a little force to subdue her," and she, while asserting that she did not strike him at all with a frying pan or anything else, testified that the husband struck her in the face, bloodied her nose and cut her lip. A witness testified that she observed the wife's cut and bleeding condition when she arrived at the marital home, shortly after the altercation, and that she, the witness, at the husband's request, then drove the husband to his mother's house.

■■ The alleged grounds for divorce here thus appear to us to be both false in fact and irrelevant in law and it is our opinion that the trial judge erred in granting the husband a divorce on the basis of the evidence indicated by the testimony in the record.

The wife's counterclaim for separate maintenance was dismissed without comment by the trial court, which would be proper if the husband were, in fact, entitled to a divorce due to the fault of the wife. Since, however, we find no legal basis for granting the divorce and since the trial court's ruling on the separate maintenance issue may have been merely a logical consequence of his ruling for the plaintiff in the divorce action, the counterclaim for separate maintenance is not foreclosed.

Our ruling as to the divorce automatically renders the property settlement decreed by the court invalid.

The judgment of the circuit court of Du Page County is reversed as to the divorce and reversed and remanded for further proceedings relative to the counterclaim for separate maintenance.

Reversed in part and reversed and remanded in part.

SEIDENFELD and GUILD, JJ., concur.