*In re* MARRIAGE OF CLAYTON KIRKPATRICK, Petitioner-Appellee, and BARBARA KIRKPATRICK, Respondent-Appellant.

Second District    No. 2—00—1411

Opinion filed April 18, 2002.

Charles A. Valente and Colby M. Green, both of Krasnow, Sanberg, Cornblath & Hobbs, of Chicago, for appellant.

Thomas M. Newman and James E. Olguin, both of Peregrine, Stime, Newman, Ritzman & Bruckner, Ltd., of Wheaton, for appellee.

JUSTICE O'MALLEY delivered the opinion of the court:

Respondent, Barbara Kirkpatrick, appeals from a judgment of dissolution of marriage that dissolved the bonds of matrimony between respondent and petitioner, Clayton Kirkpatrick. The judgment was based on the trial court's finding that respondent was guilty of extreme and repeated mental cruelty toward petitioner. Respondent contends that the trial court erred in making its finding because (1) her conduct in merely leaving petitioner was not mental cruelty but at most was desertion for less than one year which, under the specific provisions of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq.* (West 2000)), does not constitute a proper ground for the dissolution of a marriage and (2) the trial court's finding of extreme and repeated mental cruelty was against the manifest weight of the evidence. For the reasons that follow, we affirm.

The parties were married in Illinois on January 8, 2000. On June 25, 2000, petitioner filed a petition for the dissolution of the marriage. The petition alleged (1) that irreconcilable differences had caused the irretrievable breakdown of the marriage and (2) that, without cause or provocation by petitioner, respondent had been guilty of extreme and repeated mental cruelty toward petitioner. On November 13, 2000, at the start of an evidentiary hearing on the petition, the trial court

granted respondent's motion for judgment on the pleadings with respect to the part of the petition based on the allegation of irreconcilable differences. The hearing then proceeded only on the allegation of extreme and repeated mental cruelty. In order to adequately address respondent's contention that the trial court's finding was against the manifest weight of the evidence, we set out in some detail the testimony and other evidence presented at the hearing.

At the evidentiary hearing, petitioner testified that his date of birth was January 8, 1915. Petitioner did not know respondent's age. January 8, 2000, the date of the wedding, was a Saturday. After the wedding, the parties returned immediately to petitioner's house in Glen Ellyn. According to petitioner, on the Wednesday following the wedding, respondent left his house and went to live in her own house in Barrington. When respondent left, she told petitioner that she needed a rest and that she wanted to take a vacation. Respondent took virtually all of her possessions with her.

Respondent had been petitioner's caretaker for about six months prior to the marriage. As petitioner's caretaker, respondent lived at petitioner's house and her duties included shopping, cooking, and cleaning. Petitioner hired respondent to live at his house "regularly." However, during the time that she was petitioner's caretaker, respondent was frequently absent from petitioner's house from Saturday night until Monday morning. Petitioner paid respondent $40,000 per year to be his caretaker.

Petitioner further testified that, prior to the marriage, when respondent was his caretaker, he gave respondent a charge card. Petitioner told respondent that she could use the charge card to purchase groceries for his household. After the marriage, respondent asked petitioner if she could continue to use the charge card. Petitioner told respondent, "yes, but don't abuse it." Petitioner had no knowledge as to whether respondent used the charge card between the time of the wedding on Saturday and the time respondent left his house the following Wednesday. Petitioner believed that after respondent left she used the charge card to purchase a new furnace, new air conditioning, and a new hot water heater for her home in Barrington. The charges for these items totaled more than $7,000. Petitioner had no interest in respondent's home in Barrington. Petitioner subsequently canceled respondent's credit card.

Petitioner further testified that after respondent moved out of his house she never came back. After respondent left, petitioner attempted to telephone respondent at her home in Barrington but got no response from respondent for several weeks. Petitioner first attempted to call respondent shortly after she left. Over the next several weeks,

petitioner made "four or five" unsuccessful attempts to call respondent. During this period, petitioner did not receive any calls, letters, or notes from respondent.

Petitioner further testified that before respondent left she offered no explanation as to why she was leaving other than that she needed a vacation. In response to petitioner's queries as to how long respondent was planning to be gone, respondent stated that "she didn't know." When respondent left petitioner's home, she took her keys to petitioner's house and a garage door opener with her. About a week after respondent left, a neighbor of petitioner found the keys and the garage door opener in the neighbor's mailbox. There was no note with these items and petitioner did not receive any communication from respondent regarding the keys and the garage door opener.

Petitioner further testified that before respondent left she did not complain to him about anything that he had done. Petitioner could not recall any controversies between him and respondent that occurred between the time that they were married and the time that respondent left. Petitioner acknowledged that respondent did not like his adult children from a prior marriage, that respondent did not want to have anything to do with his children, and that respondent did not want his children to come to petitioner's house.

Petitioner further testified that at the time of his marriage to respondent he had medical problems. Petitioner's medical problems included trouble with his spine and legs, heart problems, and problems related to a prior series of strokes. Petitioner was under the care of physicians for these problems. Because of these medical problems, petitioner's physicians had recommended that he have a full-time caretaker. A full-time caretaker was necessary because petitioner's physicians had advised him that if he had another stroke it could be fatal unless he received immediate attention. Petitioner had discussed this need for full-time care with respondent. It was petitioner's expectation that if he married respondent she would be with him 24 hours a day. Petitioner believed that respondent understood this expectation.

Petitioner further testified that when respondent left she did not make any arrangements to have someone else take care of him. Immediately after respondent left, one or the other of petitioner's sons came to petitioner's home from time to time to check on petitioner. However, petitioner was without full-time care. Petitioner subsequently hired another full-time caretaker.

Petitioner further testified that for years prior to his marriage to respondent he had been on various medications. After respondent left, petitioner began taking additional medications that he had not previ-

ously taken. One of these medications was Zoloft. Petitioner testified that he was taking Zoloft for "depression and a few other things, loss of memory, unconscious fears of things and things like that where I was not cogitating very well." Before respondent left, petitioner had not suffered from such mental difficulties. Petitioner presented a document that was described as a document that a pharmacist gave petitioner when he obtained the Zoloft. The document was admitted into evidence. Petitioner also began taking another medication after respondent left. This medication, which petitioner could not recall the name of, was for the relief of tensions. Petitioner described his physical condition since respondent left by stating, "[w]ell, I'm an old man and my health continues to erode and I think probably I'm less capable of living well than I was at that time."

Petitioner further testified that he never received an explanation from respondent as to why she left his home on the Wednesday following their wedding. After respondent left, petitioner first talked to respondent in a telephone conversation with her about three or four weeks later. Petitioner and respondent subsequently had several additional telephone conversations. During one of these conversations, petitioner asked respondent if she was coming back. Respondent stated that she wanted to come back but did not know when that would be. During one of these phone calls, respondent asked petitioner about the possibility of repairing the marriage. Petitioner testified that he ducked the question and respondent then hung up. In subsequent calls and letters, respondent stated that she wanted to return to petitioner's home. However, respondent never returned. Petitioner testified that it was his desire to have his marriage dissolved.

On cross-examination, petitioner acknowledged that during the entire time that he knew respondent, both before and after the marriage, respondent never acted toward him in anything other than a loving, caring manner. After respondent left, petitioner never told respondent that he wanted her to come back with him. Petitioner explained that after respondent left he began taking Zoloft for the troubles that he was having with his brain, which "wasn't functioning very well." Petitioner considered respondent's leaving to be a factor in his brain not functioning very well because he was upset by her leaving and her refusal to talk to him for several weeks. Petitioner testified that he married respondent because he thought it would be a good marriage and because he "figured if she was married she would stay with [him], whereas before she would spend a lot of time in Barrington." Petitioner's principal concern after respondent left was that respondent was no longer in his house to take care of him. Petitioner estimated his net worth to be about $12 million.

Petitioner acknowledged that he signed an answer to a bill of particulars that respondent had filed. At respondent's request, the trial court took judicial notice of one of petitioner's answers to the bill of particulars. (We conclude that the trial court viewed the answer as a judicial admission.) That answer stated, "petitioner takes several prescription medications for various physical ailments; [h]owever, none are directly related to the emotional tension suffered as a result of the petitioner's failed marriage."

On examination by petitioner's attorney, respondent testified that her date of birth was February 3, 1939. After respondent and petitioner were married, respondent initially stayed with petitioner in his house. However, respondent was currently residing in her own house in Barrington. According to respondent, she left petitioner's house on the Thursday following the wedding. Respondent testified that she tried to come back the following Sunday. On that Sunday, respondent went to petitioner's house. However, when respondent arrived at petitioner's house she did not go in because, based on the cars parked in the driveway, respondent believed that all of petitioner's children were in the house. Respondent walked up to the front door but decided not to go in because "it would just be nothing but yelling and screaming. I didn't want any part of it." Respondent has not gone back to petitioner's house since that Sunday. Respondent acknowledged that she dropped her keys to petitioner's house and her garage door opener in the mail box of one of petitioner's neighbors.

After leaving petitioner, respondent went to stay at her house in Barrington. Respondent subsequently used the credit card that she had received from petitioner to purchase a furnace and air conditioning for her house in Barrington. Respondent used the credit card because the furnace went out and respondent did not have any other money. Respondent testified that her purchase of the furnace and the air conditioning was a package deal.

Respondent denied any knowledge of petitioner's attempts to call her after she left him. Respondent acknowledged that she had caller ID in her home but testified that it did not always work. After respondent's furnace went out, respondent lived with her daughter for a while. Respondent testified that she tried to call petitioner about once a week after she left him but got no answer.

On examination by her own attorney, respondent explained why she left the keys and the garage door opener in the mailbox of one of petitioner's neighbors as follows:

"Because his kids were cruel and mean to me starting the very next morning after we got married, calling, making accusations, demands. They wanted a lie detector test.

> I mean they just made life so miserable and unbearable that I just couldn't handle it, and that's not—I thought Curt would at least stand up for me, but he took their sides in everything, and they were calling me a thief over a set, dumb set of dishes that couldn't even have been worth a hundred dollars.
>
> And then the pressure got so bad on me that I just left, and I thought it would settle down if I left and he could have a talk with them and get everything under some kind of control.
>
> He was running to see his attorney, he was running—I wasn't allowed to answer the telephone. He wanted me just to sit inside the house, not go anyplace.
>
> So I felt like I was just forced out of there. And I put the keys in the mailbox. I was going to come back and all his kids were there and I thought, oh no, it's just more problems than its worth."

On additional direct examination by her attorney, respondent testified that when she left petitioner she did not plan on it being a permanent move. Respondent still wanted to come back to petitioner and hoped that it could be worked out. Respondent introduced a letter into evidence that she asked her attorney to write to petitioner's attorney about a week after she left petitioner. In the letter, respondent requested a reconciliation meeting.

In rebuttal testimony, petitioner testified that his children were not against his marriage to respondent. Petitioner had talked to all of his children and they had accepted the marriage. Petitioner denied any knowledge of his children being angry with respondent the morning after the wedding or being angry with or harassing respondent at any other time after the wedding.

On cross-examination, petitioner acknowledged that he was not always present in every room of his house with his children when they were in the house. On redirect examination, petitioner testified that respondent never indicated to him that his children were harassing her. Respondent told petitioner only that she did not like his children.

The trial court found that petitioner had proved by good and sufficient evidence the allegation in the petition that respondent was guilty of extreme and repeated mental cruelty. In making its finding, the trial court commented:

> "The essence of this case is, in fact, on grounds. The petitioner has alleged that the respondent has been guilty of extreme and repeated mental cruelty without any cause or provocation on his part.
>
> The essence of mental cruelty is the effect upon the petitioner and its effect on the mental and physical well-being of the party who is allegedly exposed to mental cruelty.
>
> In this case given Mr. Kirkpatrick's physical condition and his

frailties and Mrs. Kirkpatrick's knowledge of those infirmities, knowledge of his need for constant and continuing care, it is the Court's finding that leaving with no word as to when she will return, how he is to care for himself, [without] making any alternative arrangements for his care and making no arrangements for his needs constitutes mental cruelty. The fact that it continued constitutes repeated mental cruelty.

The Court is certainly able to infer that the effect on anyone in the condition of Mr. Kirkpatrick would be debilitating and would have a deleterious effect on him."

The trial court subsequently entered a judgment dissolving the parties' marriage. Respondent filed a timely notice of appeal.

On appeal, respondent contends that she is entitled to the reversal of the trial court's finding that she was guilty of extreme and repeated mental cruelty and to the vacation of the judgment of dissolution. Respondent argues that the trial court erred in making the finding because (1) her conduct in merely leaving petitioner was not mental cruelty but at most was desertion for less than one year which, under the specific provisions of the Act, could not constitute a proper ground for the dissolution; and (2) even if merely leaving one's spouse could constitute extreme and repeated mental cruelty, the trial court's finding that her conduct in merely leaving petitioner constituted extreme and repeated mental cruelty was against the manifest weight of the evidence.

■ Respondent's first argument based on the provisions of the Act consists of several subarguments. Respondent initially argues that the real basis of the trial court's finding was desertion rather than extreme and repeated mental cruelty. In support of this position, respondent correctly notes that Illinois courts have defined extreme and repeated mental cruelty as:

"[A]n unprovoked 'course of abusive and humiliating treatment, calculated or obviously of the nature to torture, discommode, or render miserable the life of the opposite spouse, which conduct actually affects the physical or mental health of the spouse.' " *Graham v. Graham*, 44 Ill. App. 3d 519, 527-28 (1976), quoting *Gregory v. Gregory*, 24 Ill. App. 3d 436, 440-41 (1974).

Respondent next asserts that petitioner failed to present any evidence that she engaged in such conduct toward petitioner. In support of this assertion, respondent maintains that the record shows that she never threatened to harm, never verbally abused, and never even argued with petitioner. Respondent also points to petitioner's own testimony that she always acted in a caring, loving way toward him. Based on this record, respondent argues that it is apparent that her leaving petitioner's home—*i.e.*, her "desertion" rather than any

mental cruelty by her toward petitioner—must have been the sole basis of the trial court's ruling.

■ Respondent next points to section 401(a)(1) of the Act (750 ILCS 5/401(a)(1) (West 2000)) and argues that certain language in section 401(a)(1) shows that the trial court's ruling was erroneous. The language in section 401(a)(1) that respondent relies on (the subject language) provides:

> "(a) The court shall enter a judgment of dissolution of marriage if *** one of the following grounds for dissolution has been proved:
>
> > (1) That, without cause or provocation by the petitioner: the respondent *** has wilfully deserted or absented himself or herself from the petitioner for the space of one year, *** or has been guilty of extreme and repeated physical or mental cruelty ***." 750 ILCS 5/401(a)(1) (West 2000).

Based on the subject language, respondent argues that the trial court's finding of mental cruelty violates one of the fundamental rules of statutory construction. According to respondent, the rule requires that where a general statutory provision and a specific statutory provision both relate to the same subject, the specific provision controls and should be applied (specificity rule). In respondent's view, in a case such as this case, a correct application of the specificity rule to the subject language would result in the language that explicitly and specifically addresses desertion controlling over the more general provisions that address mental cruelty.

Respondent further argues that when the statute is construed in this way it is clear that the language addressing desertion should control whether her leaving petitioner, which she characterizes as a desertion, constituted a sufficient ground for the dissolution. Respondent concludes that the trial court erred because her desertion of petitioner was for less than one year and section 401(a)(1) provides that desertion is a sufficient ground for dissolution only if it was "for the space of one year" (750 ILCS 5/401(a)(1) (West 2000)).

Respondent's argument requires us to construe section 401(a)(1) of the Act (750 ILCS 5/401(a)(1) (West 2000)). Familiar principles guide us when construing a statute.

■ The primary goal of statutory construction is to ascertain and give effect to the true intent of the legislature. *In re Marriage of Kates*, 198 Ill. 2d 156, 163 (2001). The best evidence of legislative intent is the language in the statute, which should be given its plain and ordinary meaning. *M.A.K. v. Rush-Presbyterian-St. Luke's Medical Center*, 198 Ill. 2d 249, 257 (2001). It is presumed that the legislature did not intend absurdity, inconvenience, or injustice in enacting the statute. *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21, 40 (2001).

■ Our supreme court has stated the specificity rule as follows: where there are two statutory provisions, one of which is general and designed to apply to cases generally, and the other is particular and relates to only one subject, the particular provision prevails. *Hernon v. E.W. Corrigan Construction Co.*, 149 Ill. 2d 190, 195 (1992). Generally, this specificity rule is applied when the two provisions are in conflict. See *Brown v. Mason*, 132 Ill. App. 3d 439, 441 (1985). Statutory construction is a question of law and our review therefore is *de novo*. *Kates*, 198 Ill. 2d at 163.

■ In this case, we agree with parts of respondent's argument. However, we disagree with respondent's overall conclusion. We agree with respondent that the language of section 401(a)(1) that specifically addresses desertion plainly applies when desertion by itself, with nothing more, is the alleged statutory ground for a dissolution. However, we disagree with respondent's argument that the specificity rule therefore applies in this case and requires her conduct to be evaluated as a desertion under the Act. Respondent does not explain how the language she relies on precludes the use of conduct such as a spouse's leaving a marriage or a separation as a factor in one of the other grounds for dissolution. We can discern nothing in the language that precludes the use of a leaving or a separation as a factor when one of the other statutory grounds for dissolution is alleged.

Here, petitioner did not base his petition for the dissolution of the marriage on respondent's alleged desertion. Rather, petitioner based the petition on respondent's alleged mental cruelty. It is true that respondent's leaving petitioner is a significant factor in the alleged mental cruelty. However, the alleged mental cruelty is not based on the leaving, *per se*. Instead, the alleged mental cruelty is based on the effects of the leaving on petitioner. As we read the Act, the specificity rule does not preclude such an allegation.

Respondent's reliance on *Voss v. Voss*, 55 Ill. App. 3d 286 (1977), *Graham v. Graham*, 44 Ill. App. 3d 519 (1976), and *Matthews v. Matthews*, 36 Ill. App. 3d 508 (1976), as additional support for her statutory construction argument does not change our conclusion. In each of these cases, the trial court granted a request for dissolution on the ground of mental cruelty and the appellate court reversed the judgment of dissolution. Respondent cites these cases as examples of the appellate court holding that desertion for less than one year does not constitute mental cruelty. Respondent also urges us to regard these cases as authority for the proposition that a desertion of less than one year cannot be considered as a factor in a determination of mental cruelty.

We are not persuaded that these cases stand for such a proposi-

tion. *Voss, Graham,* and *Matthews* each involved an alleged desertion or separation in the context of a claim of mental cruelty. It is true that in each of these cases the appellate court reversed a finding of mental cruelty. However, none of the reversals was because the appellate court held that the desertion or separation could not be a factor in determining whether mental cruelty was proved. Rather, in each of these cases the appellate court determined that the effect of the desertion or separation in that particular case had not been proved. See *Voss,* 55 Ill. App. 3d at 289 (record showed complainant encouraged spouse's vacation until dispute over payment for it); *Graham,* 44 Ill. App. 3d at 527 (husband did not prove that wife refused to accompany him when he moved because of his job); *Matthews,* 36 Ill. App. 3d at 510-11 (wife stayed away for health reasons on doctor's advice).

For all these reasons, we conclude that respondent's statutory construction argument does not require the reversal of the trial court's finding.

Respondent next argues that the trial court's finding was against the manifest weight of the evidence. In support of this argument, respondent asserts that there was no evidence that her leaving petitioner (1) was cruel to petitioner or (2) had any effect on petitioner's physical or mental health.

Along with several other grounds for dissolution, the Act provides for dissolution upon proof that, "without cause or provocation by the petitioner," the respondent "has been guilty of extreme and repeated *** mental cruelty." 750 ILCS 5/401(a)(1) (West 2000). We have set forth above the Illinois courts' definition of mental cruelty.

■ The determination of the issue of grounds for the dissolution of a marriage is a matter for the trial court, and the trial court's finding will not be disturbed unless it is against the manifest weight of the evidence. *In re Marriage of Jerome,* 255 Ill. App. 3d 374, 390 (1994). Because a determination of whether the evidence constitutes sufficient proof of mental cruelty depends on the circumstances of each case, and because the assessment of the evidence is best done by the trial court, great deference is given to a trial court's finding that the evidence was sufficient to establish the ground of mental cruelty. *Hollo v. Hollo,* 131 Ill. App. 3d 119, 122 (1985).

■ Whether a respondent's alleged misconduct constituted mental cruelty is determined primarily by the effect of the alleged misconduct on the complaining party. *In re Marriage of Semmler,* 90 Ill. App. 3d 649, 653 (1980). Therefore, a trial court's determination is necessarily highly individualized and depends on the total factual background of each case. *Semmler,* 90 Ill. App. 3d at 653.

■ In this case, the trial court's comments show that it ap-

propriately focused on the effect of respondent's alleged misconduct on petitioner's mental and physical well-being. The record shows that respondent was well aware of petitioner's frailties and petitioner's need for constant care. Nonetheless, respondent left petitioner without indicating whether or when she would return and without making alternative arrangements for petitioner's care. The trial court inferred from the evidence that respondent's conduct was debilitating to petitioner and had a deleterious effect on him. The trial court therefore concluded that this conduct constituted mental cruelty and that its continuation constituted repeated mental cruelty.

In view of the entire factual background of this case, we cannot say that the trial court's determination that respondent's conduct constituted extreme and repeated mental cruelty was against the manifest weight of the evidence.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

McLAREN and BYRNE, JJ., concur.