2025 IL App (1st) 231478-U

No. 1-23-1478

First Division
April 7, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| IN RE MARRIAGE OF: | ) | Appeal from the |
| | ) | Circuit Court of Cook County, Illinois |
| ERIC LUGO, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 2018 D 530308 |
| | ) | |
| CAREY LUGO, | ) | Honorable |
| | ) | D. Renee Jackson |
| Respondent-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Trial court's dissolution judgment pursuant to the Illinois Marriage and Dissolution of Marriage Act is affirmed where the court: (1) issued a sanction pursuant to Supreme Court Rule 219 against respondent-appellant where she failed to comply with discovery; (2) found that petitioner-appellee met his burden in establishing grounds for divorce; and (3) denied respondent's request for petitioner to contribute to her attorney fees. Respondent's violation of Illinois Supreme Court Rule 341(h)(7) forfeited her challenges to the trial court's findings regarding: (1) maintenance and income imputation; (2) the division of petitioner's retirement pension; (3) contribution to the parties' minor child's healthcare expenses; and (4)

respondent's responsibility to pay for a portion of parental supervised visitation and coordinating costs.

¶ 2    This case stems from dissolution of marriage proceedings between petitioner-appellee, Eric Lugo (Eric), and respondent-appellant, Carey Lugo (Carey), pursuant to the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101, *et seq.* (West 2016)). In April 2018, Eric filed a petition for dissolution, alleging irreconcilable differences. Eric requested that both parties be responsible for decision-making for the party's minor child, A.L. Finally, he waived child support and asked that both parties be barred from receiving maintenance. Carey filed no response.

¶ 3    Following a court order in August 2018 requiring the parties to file financial affidavits, the case languished for a variety of reasons, including Carey's failure to file a financial affidavit, failure to respond to discovery, and her changing of counsel on the eve of trial. Additionally, prior to the start of the first scheduled trial date in 2020, Eric filed a motion *in limine* barring Carey's testimony on any financial matters, including any need for maintenance. Carey was given an additional 28 days to comply with outstanding discovery. She again failed to comply, and the court entered an order barring her testimony as to such matters.

¶ 4    After more continuances and the appointment of a guardian *ad litem*, a bench trial, followed by a hearing on Carey's petition for contribution for attorney fees, was held over the course of a year. Finally, on July 14 and July 17, 2023, respectively, the trial court denied Carey's request for fees and entered a dissolution judgment. Relevant here, the court denied maintenance to Carey and granted her 30% of Eric's pension. Additionally, the court denied Carey's request for unsupervised parenting time and required her to pay for 100% of parental supervision fees, as well as 50% of the minor child's healthcare expenses.

¶ 5 Now on appeal, Carey argues that the trial court made multiple errors in its related rulings. Specifically, she contends that: (1) the court abused its discretion when it barred her from testifying as to financial matters; (2) the court's finding that grounds for dissolution of marriage was against the manifest weight of the evidence; (3) the court erred when it denied Carey's request for maintenance; (4) the court abused its discretion by only awarding 30% of Eric's marital pension to her, as well as failing to address a second account; (5) the court abused its discretion by ordering her to pay for 50% of the minor child's healthcare expenses, 60% of parenting coordinator costs, and 100% of supervised visitation costs; and (6) the court abused its discretion in denying her petition for contribution to her attorney fees. For the reasons that follow, we affirm the decision of the trial court.

¶ 6                                    I. BACKGROUND

¶ 7                         A. The Parties' Divorce Proceedings

¶ 8 The following facts are derived from the record on appeal.[1] Eric and Carey were married on December 28, 2007, in Illinois. The marriage resulted in two children, Jillian,[2] and A.L. At the time of the filing of Eric's petition, Jillian was emancipated and A.L. was eight years old, and Eric lived in La Grange, Illinois, while Carey lived in Chicago.

¶ 9 Sometime in 2014 or 2015,[3] the parties separated. On April 25, 2018, Eric filed a *pro se* form order petition for dissolution in the circuit court of Cook County. Therein, he alleged that the parties had separated on or about January 2014, that irreconcilable differences had caused an irretrievable breakdown of the marriage, efforts at reconciliation had failed, and future efforts

---

[1]The record reflects that Judge Joan M. Kubalanza first presided over this case up until her retirement, followed by Judge D. Renee Jackson.

[2]The parties' eldest daughter's name is spelled differently throughout the record.

[3]The parties disagree as to the precise date of separation.

would be impractical and not in the best interest of the family. Eric further alleged that he was employed as an electrical apprentice and that Carey was unemployed but asserted that both were capable of supporting themselves and should be barred from receiving maintenance or child support. Eric also sought a majority of parenting time for A.L., despite alleging that both parties were fit and proper to have joint decision-making responsibilities.

¶ 10    On July 10, 2018, Carey filed an appearance, identifying Michael Walsh as counsel. An appearance was filed on Eric's behalf in August 2018.

¶ 11                                    1. Pre-Trial Proceedings

¶ 12    On August 2, 2018, the trial court entered an order setting the case for status and ordered the parties to exchange financial affidavits within 28 days. Eric subsequently propounded discovery to Carey within the court-ordered deadline. He also filed his financial affidavit with supporting documents.[4]

¶ 13    The matter was continued multiple times for status on settlement and parenting plans. On September 27, 2019, on the court's own motion, a guardian *ad litem* (GAL) was appointed for A.L., with Eric to pay a majority of the GAL's costs. In a separate order, Carey was granted supervised parenting time every other weekend with A.L., and Eric was to enroll her in therapy. The matter was continued for status in light of a pending Department of Children and Family Services (DCFS) investigation against Carey.[5]

---

[4]The affidavit does not appear in the record on appeal, but Carey attaches it to the appendix of her brief. We discuss the propriety of this attachment later.

[5]There is no documentary evidence in the record regarding this investigation.

¶ 14    On December 12, 2019, the court entered an order requiring Carey to undergo drug and alcohol testing and a psychological evaluation. Both parties and the GAL were ordered to research options for low-cost drug and alcohol evaluations, as well as a visitation supervisor.

¶ 15    On February 2, 2020, the court entered various orders allowing Carey to have supervised parenting time with Metropolitan Family Services (MFS) on a temporary basis. Carey was to pay for the visits on a sliding scale fee schedule. Eric was also ordered to research insurance coverage for a parenting capacity evaluation. Lastly, Carey was ordered to undergo further drug testing.

¶ 16                    2. Proceedings Related to Carey's Discovery Sanction

¶ 17    On October 1, 2020, Eric's counsel propounded additional discovery to Carey. The next day, on October 2, 2020, Carey's counsel, Walsh, filed a motion to withdraw. Therein, counsel stated that he and Carey had "reached an impasse with regard to the strategy and the direction" of the case, and that Carey had "expressed extreme disappointment in the representation provided by counsel." Walsh further asserted that he had not had any recent communication with her.

¶ 18    On November 16, 2020, Eric filed a motion *in limine* to bar Carey from testifying to certain financial matters or calling any additional witnesses not previously disclosed pursuant to Supreme Court Rule 219(c). Therein, Eric asserted that, after the matter had been set for trial, he had propounded discovery to Carey. She had failed to respond, and according to Eric, her attorney had indicated that it was "unlikely that any responses would be forthcoming." As such, Eric requested that Carey be barred from testifying as to: (a) her income, expenses, assets, and liabilities; (b) her current employment and work history; (c) the value of any marital or non-marital assets or liabilities; (d) her wishes as to the allocation of assets and liabilities; and (e) any need for financial support, including child support and maintenance. Eric further requested that Carey pay any

reasonable attorney fees and costs expended in bringing the motion, and that the court impose a monetary penalty for failure to comply with discovery.

¶ 19     On November 19, 2020, an order was entered requiring Carey to undergo a parental capacity evaluation, as well as to engage in recommended services as determined by the evaluation. That same day, an additional agreed order, entered by Judge Kubalanza, continued trial to March 22, 2021. The order further stated that no other continuances would be granted. Carey was further ordered to immediately schedule and "fully cooperate" in completing the evaluation at risk of having her parenting time reduced. The court also entered and continued Carey's counsel's motion to withdraw. Finally, the agreed order entered and continued Eric's motion *in limine*. However, it expressly ordered Carey to provide responses to Eric's discovery requests within 28 days and warned that "[i]f Carey fail[ed] to provide responses to Eric's requests, she shall be barred from testifying regarding financial issues."

¶ 20     The case continued to be delayed due to Carey's failure to complete the evaluation and her drug and alcohol testing. Over Eric's objection, the March 22, 2021, trial date was stricken and a pretrial conference set for July 15, 2021.

¶ 21     Following the pretrial conference, in an order entered by Judge Jackson, Carey's counsel's motion to withdraw was continued to August 25, 2021, and Carey was given 21 days to retain new counsel. The order further stated that new counsel had to be "ready to proceed to trial" at a rescheduled trial date in November. Finally, the order also delineated the issues at trial, stating:

> "6. This [c]ourt recognizes that the main focus of the trial will be parenting issues, that there are limited marital assets, and that the issues of maintenance and child support will be straightforward in nature and of minimal focus at trial. Further, this [c]ourt has previously ordered on November 19, 2020, that Carey shall be barred from testifying on

any financial issues for her failure to provide answers to [Eric's] discovery requests, and said order remains in effect.

7. While this [c]ourt is not re-opening discovery, the parties may exchange witness lists, exhibits to be used at trial, and any motions in limine by November 4, 2021. The same shall be provided to the [c]ourt seven days before trial, on November 11, 2021."

¶ 22 On August 25, 2021, the court granted Walsh's motion to withdraw. Carey was granted an additional 21 days to obtain new counsel or file a *pro se* appearance. The order further stated that the case would proceed to trial on November 18, 2021, "with or without [Carey] having counsel pursuant to this [c]ourt's order of July 15, 2021."

¶ 23                                    3. Continued Pre-Trial Proceedings

¶ 24 On September 16, 2021, Eric filed a motion for default against Carey for her failure to file an appearance. On September 28, 2021, new counsel filed an appearance on Carey's behalf and propounded discovery to Eric a few days later. In particular, Carey's counsel included a Rule 231(f) witness disclosure, indicating that, besides identifying Eric as an adverse witness, she would be her sole witness and would testify to, *inter alia*, lifestyle, standard of living, marital assets, income and expenses, and employment.

¶ 25 On November 18, 2021, Carey filed a petition for contribution to final attorney fees and costs. Therein, Carey asserted that she had borrowed money from her mother to pay her past fees and was unable to pay her outstanding balance. In support of her request, she attached her own affidavit and that of her counsel. In her affidavit, she asserted that her gross income in 2020 was $1,238.00, and that she lacked sufficient resources to pay her remaining balance, which her counsel's affidavit averred was $886.25.

¶ 26                                              4. Trial

¶ 27    Trial commenced on November 18, 2021, but, over Eric's objection, was continued to May 10, 2023, for various reasons,[6] including Carey's purported contraction of COVID-19, as well as her failure to disclose her bankruptcy filing in federal court.[7]

¶ 28                                    a. Eric Lugo

¶ 29    On direct examination by his counsel, Eric testified as follows. He was 45 years old and lived in Shorewood, Illinois, with his fiancé Kristen Calhoun, A.L., and his two children with Kristen.[8] He had graduated from high school, attended some college, and had completed electrical trade school. He was employed as an electrician and worked for the local IBEW 134 union chapter.

¶ 30    Eric and Carey had been married since December 28, 2007, but had been separated since 2014 or about eight and a half years while living in Missouri. The separation followed an argument in which Carey became physically abusive towards him. Eric left the home and traveled to his mother's residence in LaGrange, Illinois. Upon arrival, he retrieved a voicemail from Carey on his mother's machine, in which Carey stated that she was "going to drive the kids off a cliff" if Eric did not return. Eric called the police, and Carey was placed under psychological evaluation for 72 hours.

---

[6]See court orders of February 18, 2022; June 21, 2022; July 12, 2022; October 25, 2022; November 3, 2022; December 7, 2022; January 12, 2023; April 11, 2023; May 10, 2023.

[7]On February 18, 2022, the second day of trial, Eric's counsel reminded the court that Carey had been barred from testifying as to financial issues. On the court's inquiry, Eric's counsel replied that Carey had never responded to discovery initially propounded in 2019, that a motion to compel had been filed, and that conferences had been held with the previous judge regarding this issue. We find neither the purported motion, nor any showing of a conference between the parties and the judges in the record. According to Carey's opening brief, no such motion was ever filed.

[8]Kristen Calhoun, Eric's fiancé, also testified that the two had been a couple since December 2017, had lived together since January 2018, and had been engaged since March 2020.

¶ 31    In March 2014, Eric had been living with his mother and Carey had moved back to Illinois. One day, he dropped the children off at Carey's mother's home, but returned after Jillian called him and told him to do so. Although he did not witness Carey become violent with anyone, there were police on the scene when he arrived, and Carey was arrested. Eric subsequently filed for an emergency order of protection on behalf of the children, which lasted for one year.

¶ 32    In 2018, when Eric filed for divorce, he had still been living with his mother. He did not know where Carey had been living at the time but knew at some point she had been living with her boyfriend. At the end of 2018 or beginning of 2019, Carey moved out of her boyfriend's home and back in with her mother.

¶ 33    Eric believed it was in A.L.'s best interest to require Carey to continue with weekly supervised visitation based on past drug use, past physical abuse, and an unstable housing situation. To his knowledge, she had not exercised any supervised visitation. Eric made all major decisions for A.L. with regard to school, healthcare, religion, and extracurricular activities. He had initially sought joint decision-making responsibility, but now believed he could not make those decisions with Carey because she would become "hostile" and "argumentative" with him during disagreements. He did not believe Carey's mother should continue as supervisor.

¶ 34    A copy of Eric's financial affidavit was admitted into evidence. He testified that there had been no substantial changes other than "normal" gains and losses to his income, assets, insurance, or retirement plans since filing. He had not incurred any major debts with the exception of attorney fees. He had a retirement pension account through IBEW, which he joined in January 2015 after he and Carey had been separated for a year. As of November 2021, the pension was valued at $80,000 but had decreased since the beginning of trial. Carey had not contributed to the account. Eric wished to waive maintenance and child support for both parties, as Carey had not contributed

to any household expenses or child support from the time of separation. He did not believe Carey was entitled to a portion of his retirement account, and the two did not share any bank accounts or assets.

¶ 35    On cross-examination, Eric testified as follows. When asked why he did not file for divorce until 2018, he stated that he could not afford to do so in 2014. He testified that he earned approximately $80,000 in 2021 but was challenged by Carey's counsel as to whether he had earned more based on his financial affidavit. He had one checking account, one savings account, and a "vacation account" with Great Lakes Credit Union. Upon inquiry about a "John Hancock retirement plan" valued at $80,000, which was listed on his affidavit, Eric testified that his pension was a "lump sum," and did not know if the pension plan was considered a savings plan. He did not have retirement benefits with G&M Electric, his union's employer.

¶ 36    Eric reiterated that Carey was not entitled to maintenance as she had not asked for any financial assistance since their separation. He was unaware of her current occupation or income given her failure to file a financial affidavit. He believed Carey was capable of supporting herself as she was a high school graduate, had gone to trade school to become a certified nurse's assistant, and believed she had also completed dental trade school.

¶ 37    On redirect examination, Eric testified that, to his knowledge, he did not have any other pension plans other than the one at John Hancock.

¶ 38                              b. Dr. Alan Childs and the GAL

¶ 39    Dr. Alan Childs and the GAL testified in Eric's case in chief. Dr. Alan Childs testified that he was a licensed clinical psychologist and had been appointed to conduct Carey's evaluation. In May 2021, he authored a report that provided four specific recommendations, namely that: (1) Eric retain major decision-making abilities with regard to A.L.; (2) Carey participate in individual

therapy with a provider certified in substance abuse disorders; (3) Carey continue psychiatric services; and (4) Carey continue supervised visitation with A.L. through a neutral agreed-upon supervisor.

¶ 40    The GAL[9] testified that she had authored a report in October 2019 regarding the allegations of Carey's physical violence towards her family. She had also provided three sets of individual recommendations in this case, including one set to Carey. Her specific recommendations aligned with Dr. Childs' recommendations. The GAL also believed that reunification therapy with A.L. was not possible at the time as Carey had failed to follow prior court recommendations, such as not seeking drug treatment or individual counseling and delaying in the completion of her evaluation.

¶ 41    On cross-examination, the GAL testified that, although there were costs for supervised visitation, the GAL was aware of Carey's financial status and knew that MFS had a sliding fee schedule based on income.

¶ 42                              c. Carey Lugo

¶ 43    On direct examination by her counsel, Carey testified as follows. She and Eric were married in 2007 and moved to Missouri in 2010 and lived there until 2014. Carey had been the primary caretaker for A.L. between 2009 and 2014. Eric's involvement had been "financial" as he was traveling for his job. In July 2014, after living with her mother in Illinois, Eric and the children moved out of the home and Carey remained. From 2014 to 2019, Eric lived with his mother in LaGrange. In 2019, Carey left her mother's house to live with her boyfriend. Carey was currently living with her mother in a four-bedroom house.

---

[9]Neither the GAL nor Dr. Childs' report appears in the appellate record.

¶ 44    Carey had not been working in 2014 as she suffered from low chronic back pain as a result of an injury in 2008, resulting in a bulging disc and linear tear. She was due for surgery this upcoming summer. Carey denied that she currently had an alcohol problem but admitted that she had been previously prescribed Xanax and oxycodone for her back pain, and that she had abused the medication. Between January 2014 and November 2019, Carey completed various stints of outpatient treatment for drug and alcohol abuse, which included stays in a psychiatric ward and in the intensive care unit at various facilities in the state. She had also been investigated by DCFS sometime in 2014. In the summer of 2015, she had been convicted of a DUI and attended AA meetings. She was currently seeing a psychiatrist and was required to provide drug and alcohol drops for another doctor, which had all come back "clean."

¶ 45    Carey testified to wanting unsupervised parenting time with A.L. as she believed A.L. was safe with her because she was no longer consuming alcohol. She admitted to slapping A.L. and believed her eldest daughter had called DCFS. In the event supervised visitation continued, Carey believed her mother would be appropriate as a supervisor. She also sought reunification therapy between herself, A.L., and Eric, and to be included in decisions regarding A.L.'s education, healthcare, and extracurricular activities.

¶ 46    Over Eric's counsel's objection, Carey testified that she was in need of spousal maintenance and also sought a portion of Eric's retirement accounts. Over a subsequent objection, Carey testified that she also wanted Eric to contribute to her attorney fees. She was "42, 43" years old, had attended high school, and had gone to trade school as a certified nursing assistant (CNA) and as a dental assistant, which she had received licensure for in 2003 and 2019, respectively.[10]

_____

[10]Carey later testified that she had been certified as a dental hygienist.

She was currently employed as a babysitter for her niece, and worked three times a week for nine hours a day. When asked about how much she was paid per month, Eric's counsel objected to this line of questioning, which the court sustained.

¶ 47    On cross-examination, Carey testified as follows. She agreed that reunification therapy was necessary, but did not believe that the GAL's recommendations for drug and alcohol classes should be followed. Carey admitted that she had never scheduled a supervised visit with MFS. Carey denied that her alcohol abuse had led to physical violence between herself and her family members. She admitted to pleading guilty in 2014 to battery of her eldest daughter and that an order of protection had been entered against her from 2014 to 2015. She admitted that, as part of her sentence, she had been ordered to undergo substance abuse screening and parenting classes and had been placed under supervision. In 2015, she had pled guilty to domestic battery against her eldest daughter and had also been arrested in 2017 for shoving her in the presence of the police. In 2017, she had also been arrested for domestic battery involving her brother. She denied telling Eric that she would give up custody of A.L. due to her internal family struggles.

¶ 48                    5. Hearing on Petition for Contribution of Attorney Fees

¶ 49    On November 3, 2022, the court began a separate hearing for Carey's petition for contribution of attorney fees, which concluded on May 10, 2023.

¶ 50                                    a. Eric

¶ 51    Upon adverse examination by Carey's counsel, Eric testified that he lived with his fiancé in a house that she had purchased for $400,000 in February 2022. He was not on the title or the mortgage. He paid her $1,200 in monthly rent, and the monthly mortgage payment was $2,000. Eric had paid $20,000 in attorney fees and still owed about $3,000. Eric had not paid Carey any maintenance since their separation in 2014 and had only contributed to her medical insurance. He

had not paid her attorney fees. He did not recall the last time Carey had worked full-time but believed it was in 2014. He was unaware of her having any assets.

¶ 52                                    b. Carey – Day 1

¶ 53    On direct examination by her own counsel, Carey testified as follows. She had retained her current attorney on September 27, 2021, and had paid him a $5,000 retainer that she borrowed from her mother. She had also borrowed money from her mother on various occasions to pay her continuing legal bills. In total, she had borrowed $14,277.14, which she was expected to repay. Currently, she had a remaining balance of $1,462.50 and did not have any assets to pay her current fees or to repay her mother.[11]

¶ 54    Over Eric's counsel's objection, Carey testified that she baby-sat for her niece two days a week during the school year.[12] She was paid $100 a week. She was trying to secure supplemental income but struggled to do so due to her lower-back injury and was currently seeing a specialist for the pain. She had last worked a full-time job in 2019 and had not "really earned anything" since. She lived with her mother, received food stamps, and had a pending application for social security benefits.

¶ 55    On cross-examination, Carey testified that her previous attorney, Mike Walsh, had represented her for three years. She had paid him $1,500 and had previously owed him a balance. However, she had filed for bankruptcy in February 2021 and believed the balance was cleared.

¶ 56    At this point in the hearing, Eric's counsel ceased questioning and indicated that she could not proceed as she had been unaware of the bankruptcy filing. Carey's counsel responded that he

---

[11]Both parties stipulated to the reasonableness of Carey's attorney fees.
[12]Eric's counsel again objected on the basis of Carey being barred to testify to financial issues. The court overruled the objection and allowed Carey to provide testimony relative to her work income.

had not represented Carey at that time and was also unaware of it. The court stopped the proceeding, indicating that it could not continue due to Carey's "unclean hands." It further admonished Carey, noting that she had been barred from testifying to financial information due to her own failure to comply with discovery, and had she complied, her bankruptcy filing would have likely come to light. The court then continued the hearing to another date.

¶ 57                                  c. Carey – Day 2

¶ 58    At the continued hearing for fees, the parties informed the court that they had learned that Carey had filed for Chapter 7 bankruptcy on November 4, 2021, and that her debt had been discharged on February 2, 2022.

¶ 59    Carey's adverse examination continued. She had obtained a dental hygienist certificate in 2019 but had never been employed in the field. She had never filed a petition for temporary maintenance. She had never paid child support because she was told that it did not have to be paid. She confirmed that she had discharged $67,042.35 in debt through her bankruptcy filing, and Walsh had been one of her creditors. She estimated her fees to be around $5,000. She had applied for disability benefits in 2008, but the claim was denied, and she had not reapplied thereafter.

¶ 60    On redirect examination, Carey testified that she had filed for bankruptcy because she had owed $30,000 in relation to a car accident. She had not held a job since receiving her dental hygienist certificate. She estimated that she had applied to "ten" different jobs, with her last application occurring in 2020. She believed that her inability to find a job in the field had been due in part to the COVID-19 pandemic.

¶ 61                          6. Trial Court's Ruling on Attorney Fees

¶ 62    On July 14, 2023, the trial court entered a written order denying Carey's petition for contribution pursuant to sections 503(j)(1-5) and 508 of the Act.[13]

¶ 63                                    7. Trial Court's Dissolution Judgment

¶ 64    On July 17, 2023, the trial court entered a dissolution judgment. Relevant here, the trial court found that Eric had proven by "competent and relevant evidence" in showing that grounds for divorce, namely irreconcilable differences, existed. The court further found that neither party had filed a petition or requested maintenance throughout the duration of the case, and, after considering the relevant evidence regarding the parties' financial positions, both were barred from receiving maintenance. As to the parties' marital assets, the court determined that Eric's IBEW pension fund, worth approximately $80,000, was marital property and awarded 30% of the pension to Carey. Next, the court ordered Eric to maintain health insurance for A.L., with Carey to reimburse Eric for 50% of all healthcare costs and each to equally share 50% of out-of-pocket expenses for medical, dental, and vision expenses. The court also denied Carey's request for unsupervised parenting time, and ordered that supervised visitation continue with Carey responsible for 100% of the cost. Finally, the court reiterated that each party was responsible for their respective attorney fees and costs. The court concluded that its judgment was final with no just reason to delay enforcement or appeal.

¶ 65    On August 16, 2023, Carey filed a timely notice of appeal.

¶ 66                                    II. ANALYSIS

¶ 67                                    A. Jurisdiction

---

[13]The court's findings on the petition for contribution and ultimate dissolution judgment are discussed more fully in our resolution of the issues presented on appeal.

¶ 68    Although not raised by either party, it is our independent duty to assess our jurisdiction in reviewing this appeal, which is only established when a party files a timely notice of appeal. *State Farm Fire & Casualty Co. v. John J. Rickhoff Sheet Metal Co.*, 394 Ill. App. 3d 548, 556 (2009); see also Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). Although liberally construed, a  notice confers jurisdiction regarding only those judgments or parts thereof specified in the notice. *People v. Smith*, 228 Ill. 2d 95, 104-05 (2008). Even so, "[a]n appeal from a final judgment draws into issue all previous interlocutory orders that produced the final judgment." *In re Marriage of Gabriel and Shamoun*, 2020 IL App (1st) 182710, ¶ 33.

¶ 69    "A petition for dissolution advances a single claim; that is, a request for an order dissolving the parties' marriage." *In re Marriage of Leopando*, 96 Ill. 2d 114, 119 (1983). However, a dissolution proceeding involves numerous ancillary issues, including property disposition and support, and thus do not represent "separate, unrelated claims," but rather, "separate issues relating to the same claim." (Emphasis removed.) *Id.* In her notice of appeal, Carey did not expressly request review of the discovery sanction, the propriety of which is raised in this appeal. Even so, because the sanction was related to the court's maintenance award, we have jurisdiction to consider it.

¶ 70                                    B. Preliminary Matters

¶ 71    Eric raises a litany of concerns related to Carey's brief. First, he argues that her Statement of Facts violates Illinois Supreme Court Rule 341(i) by failing to include all the facts relevant to the case, including the existence of an agreed order that led to Carey being barred from testifying as to financial matters. Second, he contends that she violated Supreme Court Rule 342 by including his financial affidavit as an exhibit to her appendix when it is not included in the record. Third, Eric asserts that Carey violated Illinois Supreme Court Rule 342(e) by failing to provide a table of

testimony. Finally, Eric asserts that Carey failed to provide appropriate citation to the record and/or supporting authority as required by Illinois Supreme Court Rule 341(h)(7).

¶ 72    As the appellant, Carey had the burden of presenting a sufficiently complete record to support her claims for error. *Midstate Siding & Window Co. v. Rogers*, 204 Ill. 2d 314, 319 (2003) (citing *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984)). We observe that Carey failed to provide for the inclusion of any trial records or exhibits, including the GAL's report, copies of Eric's financial records, or anything she might have submitted during trial. As such, when the record on appeal is incomplete, a reviewing court may "indulge in every reasonable presumption favorable to the judgment from which the appeal is taken, including that the trial court ruled or acted correctly." (Internal citations and quotations omitted.) *Fraser v. Jackson*, 2014 IL App (2d) 130283, ¶ 22. It appears that Carey attempted to remedy this omission by affixing Eric's financial affidavit to the appendix of her brief. Although our rules require the filing of such an appendix, we cannot consider the affidavit in our resolution of the case, given that it was not included in the record on appeal. See Ill. S. Ct. R. 341(h)(9) (eff. Oct. 1, 2020); Ill. S. Ct. R. 342 (eff. Oct. 1, 2019); *Oruta v. B.E.W. and Continental*, 2016 IL App (1st) 152735, ¶ 32 (courts shall disregard any documents included in an appendix to a brief that were not included in the record on appeal).

¶ 73    Finally, regarding Carey's purported violations of the statement of facts and her failure to provide appropriate citations in support of her arguments, we consider each instance along with our consideration of her issues on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (appellant's brief must contain citations to authority in accordance with his or her contentions on appeal); Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020) (appellant's statement of facts must contain an accurate and fair recitation of facts necessary to an understanding of the case.) Nevertheless, we admonish Carey

for her failure to adhere to our supreme court rules, which "are not advisory suggestions, but rules to be followed." *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57.

¶ 74                    C. The Illinois Marriage and Dissolution of Marriage Act

¶ 75    The Act "was created to create a uniform law governing domestic relations." *In re Marriage of Thompson*, 79 Ill. App. 3d 310, 313 (1979). "[A] trial court's authority to act in dissolution proceedings is conferred only by statute" and "[t]he trial court may not rely upon its general equity powers." *In re Marriage of Ignatius*, 338 Ill. App. 3d 652, 657 (2003); see also *In re Marriage of Blum and Koster*, 377 Ill. App. 3d 509, 526 (2007), *rev'd on other grounds*, 253 Ill. 2d 21 (2009) ("The dissolution of marriage is entirely statutory in origin and nature, and courts in dissolution cases must exercise their powers within the limit of Act.") However, the Act is also to be "liberally construed" to "promote its underlying purposes." 750 ILCS 5/102 (West 2016). Such purposes include "promot[ing] the amicable settlement of disputes that have arisen between parties to a marriage" (750 ILCS 5/102(3) (West 2016)), "ensur[ing] predictable decision-making for the care of children and for the allocation of parenting time and other parental responsibilities" (750 ILCS 5/102(5) (West 2016)), determining the best interest of children borne to the marriage (750 ILCS 5/102(7) (West 2016)), "mak[ing] reasonable provision for support during and after an dissolution of marriage" (750 ILCS 5/102(8) (West 2016)), and "eliminat[ing] the consideration of marital misconduct in the adjudication of rights and duties incident to the dissolution of marriage" (750 ILCS 5/102(9) (West 2016)). Finally, before judgment, a court must consider and make provisions for issues such as allocation of parental responsibility, maintenance for either spouse, or disposition of property. 750 ILCS 5/401(b) (West 2016).

¶ 76                         1. Grounds for Dissolution

¶ 77    We begin with Carey's argument that the trial court erred when it found that grounds for dissolution existed, as our disposition of that issue will inform the scope of our review. Specifically, Carey contends that Eric failed to establish that irreconcilable differences had caused the irretrievable breakdown of the marriage, and that future attempts at reconciliation would be impracticable and not in the best interest of the family. Carey points out that Eric's petition only alleged irreconcilable differences, and he made no attempt to conform his pleadings to the proof presented. As such, Carey maintains that the court's finding was against the manifest weight of the evidence. In support, but without any accompanying analysis, Carey cites *In re Marriage of Rittmeyer*, 107 Ill. App. 3d 892 (1982).[14]

¶ 78    Preliminarily, Eric responds that Carey fails to support her contention with any citation to the record in violation of Rule 341(h)(7). Substantively, Eric contends that the record is replete with evidence that the parties' marriage was irretrievably broken, notably shown through: (a) his petition; (b) his testimony that he and the children fled the marital residence because Carey was addicted to drugs, had physically abused him, and had threatened to kill herself and the children; (c) their nine-year separation prior to the entry of the dissolution judgment; and (d) both parties engaging in other relationships, including Eric living with, becoming engaged to, and fathering two children with another. As such, Eric concludes, the evidence showed that he did not wish to remain married to Carey, which established irreconcilable differences that led to the irretrievable breakdown of the marriage, citing *In re Marriage of Smoller*, 218 Ill. App. 3d 340 (1991).

¶ 79    In reply, Carey shifts the focus of her contention. Rather than address Eric's assertion regarding the breakdown, Carey posits that Eric never presented any evidence to show that there

---

[14]*Rittmeyer* was decided under a prior version of the Act which required proof of a specific ground for dissolution.

were efforts made to reconcile, or that future attempts to reconcile would be impractical or not in the best interest of the family.

¶ 80    Pursuant to Section 401 of the Act, the court must make a finding that "irreconcilable differences have caused the irretrievable breakdown of the marriage and that efforts at reconciliation have failed or that future attempts at reconciliation would be impracticable and not in the best interests of the family. 750 ILCS 5/401(a) (West 2016). "Irreconcilable differences ha[ve] been defined as the existence of marital problems which have so impaired the marriage relationship that the legitimate objects of matrimony have been destroyed" and an "irretrievable breakdown of a marriage has been defined as where either or both parties are unable or refuse to cohabit and there are no prospects for a reconciliation." (Internal citations omitted.) *In re Marriage of Bates*, 141 Ill. App. 3d 566, 570 (1986).

¶ 81    The court's finding as to whether the petitioner has failed to establish grounds for dissolution is assessed under the manifest weight of the evidence standard. *In re Marriage of Kirkpatrick,* 392 Ill App. 3d 202, 212 (2002). "Findings are against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." (Internal quotations and citations omitted.). *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 30.

¶ 82    Initially, we note that Carey failed to file an answer to the petition or a counter-petition denying that irreconcilable differences existed, thereby admitting the allegations therein. See *In re Marriage of Epting*, 2012 IL App (1st) 113727, ¶ 30 (by failing to file an answer to the divorce petition, appellant failed to deny allegation that parties lived in Illinois for 90 days and thus it was deemed admitted); see also *Roth v. Roth*, 45 Ill. 2d 19, 23 (1977) (the "purpose of pleading is to develop the issues to be determined. A failure to respond to an adversary pleading may constitute

an admission of all the facts well pleaded by adversary and admissions thus drawn from a failure to plead may be considered as evidence.")

¶ 83    Further, and notwithstanding the substantial trial testimony, Carey cites nothing in the record to support her contention. It is not the function of this court to comb the record in support of a party's claim. Having presented nothing in support of her argument, we deem the issue forfeited. See Ill. S. Ct. R. 341(h)(7); *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 401 Ill. App. 3d 868, 881 (2010) (mere contentions without citation of authority merit no consideration on appeal); *International Union of Operating Engineers Local 965 v. Illinois Labor Relations Board, State Panel*, 2015 IL App (4th) 140352, ¶ 20 (a party forfeits review of issue on appeal by failing to support its argument with citation to authorities).

¶ 84    However, even a cursory review of the record reveals sufficient evidence to support the court's determination. Specifically, as noted by the court, the parties' formal separation in 2014 occurred after Eric vacated the joint residence due to Carey's alleged physical abuse, as well as after Carey's threat to hurt herself and the children if he did not return.[15] In the years apart, both Carey and Eric became involved in other relationships. Additionally, although it is true that Carey testified to wanting reunification therapy with A.L. and Eric, the record shows that both parties, as well the GAL, testified to Eric and Carey having very little communication since their separation. See *In re Marriage of Kenik*, 181 Ill. App. 3d 266, 273-74 (1989) (relevant considerations regarding parties living separate lives include whether the parties had ceased marital relations, as well as the type of communication or lack thereof).

---

[15]There is some conflicting testimony between Eric and Carey regarding the date of separation.

¶ 85    Moreover, even if the court were to disregard all of the evidence concerning the breakdown of the marriage, section 401(a-5) of the Act specifically provides that if the parties had lived separate and apart for a period of at least 6 continuous months immediately preceding the dissolution judgment, there is an irrebuttable presumption of irreconcilable differences. See 750 ILCS 5/401(a-5) (West 2016). The record reflects that Carey and Eric have not lived together since at least 2015. Accordingly, we can find no error based on this record.

¶ 86                          2. Section 219(c) Discovery Sanction

¶ 87    In little more than three paragraphs, one of which is devoted entirely to a recitation of the factors relevant to a determination of the propriety of discovery sanctions, Carey contends that imposition of sanctions against her was an abuse of the trial court's discretion.

¶ 88     In paragraph one of her argument, Carey contends that the trial court abused its discretion by barring her testimony to any financial matters, which in turn affected many of the court's decisions, such as maintenance and attorney fees.[16] She asserts that Eric did not propound discovery until October 1, 2020, when the trial had originally been set for November 19, 2020, and where the case had been pending for more than two years. Although Carey admits that she did not respond to Eric's discovery requests for almost a year after discovery was propounded, she notes that Eric failed to engage in Supreme Court Rule 201(k) communications prior to filing his motion *in limine*.

¶ 89    In paragraph two, citing *In re Marriage of Booher*, 313 Ill. App. 3d 356 (2000), and *In re Marriage of Liszka*, 2016 IL App (3d) 150238, Carey sets forth, verbatim, the six factors stated

---

[16]We preface our discussion with the acknowledgement that the sanction against Carey was entered pretrial by Judge Kubalanza. However, the barring of certain financial testimony re-emerged as a topic of discussion throughout the trial proceedings, and the overall sanction was reaffirmed by Judge Jackson.

therein relevant to an analysis of the court's exercise of discretion in imposing sanctions. She then concludes that barring a witness's testimony is a drastic measure and should only be imposed when a party unreasonably fails to comply with the court's discovery rules.

¶ 90    In her third and final paragraph on the issue, Carey states that she was barred from offering testimony on financial matters because she "did not answer written discovery 9 1/2 months after petitioner first requested the information." Further, she again notes that, by the time of the request, no motion to compel had been filed, and no Rule 201(k) conference had been held nor was there a letter submitted by Eric. Carey also posits that barring testimony as to her "paltry income as a babysitter" was a drastic sanction. Further, she asserts that the record reveals that she suffered from a substance abuse problem, did not have significant resources, was unemployed, and not seeking child support. Accordingly, from Carey's perspective, evidence not provided through discovery but presented at trial would not have resulted in a surprise to Eric. Finally, she maintains that because all of this information was known to Eric, none would have had any "prejudicial effect" if she had been permitted to testify.

¶ 91    Eric refutes Carey's assertion that he did not propound discovery until October 1, 2020, given that she had been ordered by the court to produce a financial affidavit in August 2018, and he had first served discovery requests on her a month later. Further, given that the sanction order was entered a year prior to the start of trial, Carey could have availed herself at any time to relieve herself from the sanction. Moreover, Eric maintains that the sanction was proper given Carey's "longstanding, outright refusal to respond to any discovery," and that the sanction was entered after an agreed order between the parties which allowed Carey more time to respond to the requests. Thus, Eric reasons that Carey was barred by her own agreement and conduct.

¶ 92    Carey's reply brief states simply that "no further argument is made" on her behalf.

¶ 93    "Discovery is intended to be, and should be, a cooperative undertaking by counsel and the parties conducted largely without court intervention." (Internal citation omitted.) *Custer v. Cerro Flow Products, Inc.*, 2019 IL App (5th) 190285, ¶ 31. When disagreements or perceived abuses of discovery arise, the trial court is authorized to enter orders supervising such activities. *Id.*; see also Ill. S. Ct. R. 201(c) (eff. March 17, 2023). Further, Supreme Court Rule 219(c) (eff. July 1, 2002) authorizes a trial court to impose a sanction on a party who unreasonably fails to comply with the court's discovery rules or orders. *In re Marriage of Booher*, 313 Ill. App. 3d 356, 359 (2000) (citing *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 120 (1998)). Relevant here, one such sanction includes barring a witness from testifying as to a certain issue. See Ill. S. Ct. R. 219 (c)(iv) (eff. July 1, 2002). The trial court's decision to sanction will not be reversed absent an abuse of discretion. *In re Marriage of Booher*, 313 Ill. App. 3d at 359.

¶ 94    Generally, "[b]arring a witness's testimony is a drastic sanction and should be exercised with caution." (Internal citation omitted.) *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 33. As Carey correctly notes in the second paragraph of her argument, courts utilize various factors to determine if a trial court abused its discretion in issuing its sanction, including (1) surprise to the adverse party, (2) prejudicial effect of the proffered evidence or testimony, (3) nature of the evidence or testimony, (4) diligence of the adverse party in seeking discovery, (5) timeliness of the adverse party's objection to the evidence or testimony, and (6) good faith of the party offering the evidence or testimony. *Id.¶* 17. No single factor is determinative, with each case to be considered on its own unique facts. *Id.*

¶ 95    The sanctions issue is arguably one of the most significant in this appeal. Yet, other than citation to the various factors, Carey offers little in the way of actual argument to persuade this court that the court abused its discretion in barring her testimony. Even accepting that Eric would

have been neither surprised nor prejudiced by Carey's non-disclosure, we can find no abuse of the court's discretion in barring Carey's testimony on the matters sought to be disclosed in discovery.

¶ 96    The record reveals that the trial court ordered the parties to file their respective financial affidavits at the start of the litigation in August 2018. Although Carey asserts that Eric did not seek discovery until October 2020, the record reflects that he initially propounded discovery on August 21, 2018, and filed his own affidavit the same day. Then, for reasons not apparent from the record, Eric did not propound discovery again until October 1, 2020, with an October 29, 2020, due date. After learning from Carey's former counsel that Carey would not respond to Eric's discovery requests, Eric then filed a motion *in limine* on November 16, 2020, three days before a set trial date of November 19, 2020. However, the November 19 trial date was stricken, and trial continued to be rescheduled due to Carey's issues with her former counsel and her need to find a new attorney, as well as her continued delay in completing her drug testing and parental capacity evaluations. Ultimately, and pursuant to the parties' "Agreed Order," trial was then rescheduled to commence in March 2021.

¶ 97    We note that here on appeal, Carey fails even to acknowledge the "Agreed Order" in which the possibility of the discovery sanction is included. In that order, Carey was given an additional 28 days to respond to outstanding discovery. The order also expressly provided that failure to comply would result in the sanction at issue. Ultimately, Carey did not comply, and on July 15, 2021, an order was entered barring her from testifying to such matters that her discovery responses would have addressed. As was pointed out by Eric, the sanction order was entered a year before trial actually commenced. Yet, Carey made no attempt to purge the sanction by complying with the discovery request or to seek reconsideration of the same.

¶ 98    Despite Carey's dilatory litigation tactics, she was still granted some leeway to provide relevant testimony. Notably, during trial and the hearing on contribution, and despite the sanction in place, the court allowed Carey's limited testimony on income, housing situation, and bankruptcy filing. Compare *In re Marriage of Booher*, 313 Ill. App. 3d at 360 (finding prejudicial effect and nature of the evidence factors too great where party could only cross-examine witness on information covered under direct examination and could not present any evidence of his own); *Smith v. PACE*, 323 Ill. App. 3d 1067, 1076-77 (2001) (reversing sanction where it prohibited even sanctioned party from calling himself as his own witness and thus denied the party a trial on the merits).

¶ 99    Although the sanction here was stringent, we do not believe it was unwarranted. The record reflects numerous instances of the trial court warning Carey of the consequences of her actions. See *In re Marriage of Keegan and Papin*, 2022 IL App (2d) 190495, ¶ 52 (even if court did not list specific reasons for entering discovery sanction, record was replete of incidents of court warning litigant of consequences for failure to comply). Further, although Eric did not file a motion to compel or attempt to engage in Rule 201(k) communications, there is enough in the record demonstrating Eric's persistence in attempting to encourage Carey's compliance with discovery. The record also reflects his cooperation to have her meet such deadlines. "To allow a party to defy a discovery order without facing sanctions can be likened to a dog without teeth—all bark and no bite. A pattern of dilatoriness should not be tolerated, as it hurts the opposing party and is a burden on the court system." *Locasto v. City of Chicago*, 2014 IL App (1st) 113576, ¶ 37. Finding no abuse of discretion, we affirm the trial court's imposition of the sanction.

¶ 100                    3. The Marital Estate and Property Division (750 ILCS 5/503)

¶ 101    Carey argues, without citation to any case or statutory provision, that the trial court abused its discretion in awarding only 30% of Eric's IBEW pension to her, as well as failing to address the marital portion of Eric's "second" retirement account. She contends that the evidence showed that Eric had two retirement plans, one with John Hancock valued at $80,000, and one through his pension with IBEW Union 134, which was separate and independent.

¶ 102    Eric preliminarily responds that Carey's argument on this issue is forfeited as she failed to cite to any authority as required by Supreme Court Rule 341(h)(7).  Forfeiture aside, Eric contends that Carey misrepresents the evidence at trial, where he only testified to a single pension and denied having an additional savings plan. Moreover, Eric points out, Carey made no attempt to determine further information as to the possibility of a second plan. Substantively, Eric maintains that the court's decision to grant 30% of the pension to Carey was reasonable, given Carey's failure to participate in financial discovery or respond to Eric's petition, as well as the fact that Carey never contributed to any of the childcare or household expenses while they lived together.

¶ 103    Carey's argument, not unlike much of her brief, suffers from conclusory statements, undeveloped arguments, and on this issue, not even one citation to authority. Further, Carey failed to provide a full record for consideration as to whether Eric had multiple pensions. It is well-established that "mere contentions, without argument or citation of authority, do not merit consideration on appeal." *Palm*, 401 Ill. App. 3d 868 at 881. We are not inclined to overlook her noncompliance with the rules which govern appeals. To do so would sanction that same conduct which resulted in barred testimony below. The issue is forfeited. See *International Union of Operating Engineers Local 965*, 2015 IL App (4th) 140352, ¶ 20. Thus, we decline consideration of this argument.

¶ 104                    4. Denial of Maintenance and Income Imputation

¶ 105   Carey next claims error in the court's maintenance determination, which also involved the court imputing a certain level of income to Carey.

¶ 106   Generally, courts are empowered to determine entitlement to and details concerning a maintenance award for "either spouse in amounts and for periods of time as the court deems just[.]" 750 ILCS 5/504(a) (West 2016). When a party challenges the trial court's factual findings regarding maintenance, a reviewing court will affirm unless the court's findings were clearly against the manifest weight of the evidence. *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 30. The court's ultimate decision to award or deny maintenance will not be reversed absent an abuse of discretion. *In re Marriage of Walker*, 386 Ill. App. 3d at 1041; see also *In re Marriage of Johnson*, 2016 IL App (5th) 140479, ¶ 93; *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 74. "An abuse of discretion occurs when no reasonable person would adopt the view taken by the trial court." *In re Marriage of Walker*, 386 Ill. App. 3d at 1041.

¶ 107   At the outset, Carey challenges the trial court's preliminary findings that she had failed to file a petition or request spousal maintenance throughout the proceedings. Carey contends that she did not have to do so in order to have a maintenance request considered, citing as support *In re Marriage of Hochleutner*, 260 Ill. App. 3d 684 (1994).

¶ 108   Preliminarily, the record reflects that Eric's petition sought a determination that Carey was not entitled to maintenance. Further, we find nothing in the record to indicate that Carey ever filed any formal request for consideration of maintenance, a fact highlighted by the trial court in its dissolution judgment. The record does, however, include a July 15, 2021 order indicating that the "main focus" at trial would be parenting issues, as the parties had "limited marital assets" and that the "issues of maintenance and child support [would] be straightforward in nature and of minimal focus at trial." In that same order, the court reaffirmed its previous warning to Carey that her failure

to comply with discovery had resulted in the barring of any testimony regarding her financial situation. Thus, the record shows that the court anticipated considering evidence as to the issue of Eric's request for denial of maintenance, and thus implicitly, whether Carey was entitled to any at all.

¶ 109 We acknowledge having held in the past that, even without a formalized request for maintenance, courts may utilize their statutory powers to award maintenance based on the circumstances of the case. Specifically, *Hochleutner*, the single case cited by Carey and decided by our sister court in the second district, holds as much.[17] In *Hochleutner*, the petitioner filed for divorce and requested that the respondent be denied maintenance. 260 Ill. App. 3d at 685. The respondent never filed a response, which was acknowledged by the trial court in its final judgment, where it stated that it was "operating under some difficulty" given the lack of responsive pleading. *Id.* at 687-88. Ultimately, however, the court determined that it could consider the maintenance request based on the petitioner's express request to deny it, and thus ordered the petitioner to pay the respondent maintenance following an evidentiary hearing. *Id.* at 685, 687-88. Even though the petitioner neither objected to the award nor filed a post-judgment motion, he appealed. *Id.*

¶ 110 On appeal, the petitioner argued that the court had exceeded its authority in ordering maintenance in the absence of a responsive pleading requesting it, and where no evidence had been presented in support. *Id.* at 685-86, 688-89. The appellate court rejected this argument, holding that the respondent's failure to plead did not divest the trial court of its statutory authority to determine that maintenance was appropriate, given that the petitioner had raised the issue in his filings, an evidentiary hearing had been conducted which included testimony as to the relevant

---

[17]*Hochleutner* was decided prior to amendments of the maintenance provision in the Act.

factors such as income and standard of living, and the petitioner had not objected to the request. *Id.* at 689-90, 691. The court further reasoned that, where the statute authorized a maintenance award under "just or equitable terms, all that [was] required to sustain the award [was] that the recipient be entitled to it and the award be equitable." *Id.* at 691.

¶ 111   Although the facts of *Hochleutner* are somewhat similar to the facts here, we believe that one of the key distinguishing features underlying the court's decision there was that the petitioner had failed to object to consideration of the maintenance request beyond the initial request for denial. On this point, we find a more recent case, *In re Marriage of Salvetiu*, 2023 IL App (1st) 211162-U, decided here in the First District, instructive.

¶ 112   In *Salvetiu*, the petitioner was ordered to pay maintenance to the respondent after his petition failed to request denial. *Id.* ¶¶ 6, 13. The petitioner subsequently filed a motion to vacate the judgment, arguing in part that the respondent had never filed a pleading requesting such support. *Id.* ¶ 14. The trial court denied the motion. ¶ 15. On appeal, the petitioner argued that the trial court had "been without jurisdiction" to award maintenance without a responsive pleading on file. *Id.* ¶¶ 15, 18. Although we acknowledged that *Hochleutner* was instructive as to the trial court's ability to award maintenance based on the Act, we nevertheless rejected the petitioner's argument. *Id.* ¶¶ 20-23. Specifically, we determined that the limited record showed the petitioner's "acquiescence" to the trial court's consideration of maintenance, where the record showed a court order indicating that maintenance would be at issue at trial, and that the petitioner had failed to object to such an agenda throughout the duration of the proceedings. *Id.* ¶¶ 24, 27-30.

¶ 113   In contrast here, the facts show that Eric did not engage in any similar acquiescence with regard to the court's maintenance determination. Eric's petition expressly sought denial of both child support and maintenance. Eric was then diligent in proffering his own financial information

and in his attempts to receive the same from Carey. When it was clear that Carey was not cooperating, he filed a motion *in limine* to bar any evidence she may have sought to introduce at trial for purposes of maintenance determinations. Further, at trial, Eric's counsel was steadfast in objecting to any testimony regarding Carey's financial status at trial and during the fee petition hearing, even though the record reflects that the trial court allowed for some leeway on Carey's part. Accordingly, the court's failure to award maintenance appears based on more than Carey's failure to request the same, but also on the manner in which the case progressed in conjunction with Eric's consistent and vocal opposition to the same. As noted prior, Carey exhibited a lackadaisal approach to her case, which included a lack of any formal request to receive maintenance, her consistent delay throughout the proceedings which culminated in a highly preclusive discovery sanction, and what the trial court termed as "unclean hands" throughout the litigation.

¶ 114 We also observe that, in the section of her brief challenging the court's maintenance determination and related income imputation, Carey failed to cite to any supporting legal authority beyond the relevant provisions of the Act. See Ill. S. Ct. R. 341(h)(7) (appellant must support appeal with citation of the *authorities* and pages of the record relied upon); *23-25 Bldg. Partnership v. Testa Produce, Inc.*, 381 Ill. App. 3d 751, 755 (2008) ("A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented," as the "appellate court is not a depository in which the appellant may dump the burden of argument and research.") (Internal quotations and citations omitted.)) Thus, because Carey continues to exhibit indifference to established court rules and procedures, we need not address any additional argument related to the trial court's maintenance determinations.

Accordingly, we find all of Carey's related challenges to the court's maintenance determination to be forfeited.

¶ 115                                  5. Childcare Expenses and Visitation Provisions

¶ 116    Carey next challenges various portions of the court's dissolution judgment addressing Carey's responsibilities related to A.L.'s healthcare and childcare. Specifically, Carey argues, again without citation to authority, that the trial court abused its discretion in ordering Carey to pay 50% of A.L.'s health insurance and medical costs, 60% of the parenting coordinator's costs, and 100% of costs for supervised visitation. Carey characterizes this portion of the order as "punishment," given the evidence established that Eric earned significantly more than she did, and that the ordered costs would in effect prevent her from seeing A.L.

¶ 117    Eric responds that Carey again fails to cite to any authority to support her contentions. Notwithstanding, Eric contends that Carey owes her daughter a duty of support, which she had failed to do for years prior, citing *In re Marriage of Turk*, 2014 IL 116730. Further, Eric continues, the record reflects that it was Carey's own conduct that necessitated such parenting requirements. Finally, Eric asserts that the court properly determined that Carey should handle the financial responsibility of such expenses.

¶ 118    We agree with Eric that Carey's argument as to both these issues is deficient and again in violation of Supreme Court Rule 341(h)(7). As she fails to cite to any relevant legal authority, including the applicable statutory provision or any case law in support of her contentions, we deem both arguments forfeited.

¶ 119                                  6. Petition for Contribution to Carey's Attorney Fees

¶ 120    Finally, Carey argues that the trial court abused its discretion in denying her petition for contribution to her attorney fees. Preliminarily, Carey again notes that, due to the sanction issued

against her, she could not demonstrate her lack of ability to pay her fees. Substantively, Carey challenges the court's finding that she was able to pay her fees, given the parties' financial disparities and that her bankruptcy filing was of no relevance to her legal fees. Eric responds that the court's denial of the petition was reasonable, given that Carey was found to be voluntarily underemployed, her lack of credibility as to her overall financial position, her lack of evidence showing that she had borrowed money to pay her previous fees, and her conduct that led to prolonged litigation.

¶ 121    "As a general rule, attorney fees are the responsibility of the party who incurred [them]." *In re Marriage of Evanoff and Tomasek*, 2016 IL App (1st) 150017, ¶ 56 (quoting *In re Marriage of Nesbitt*, 377 Ill. App. 3d 649, 656 (2007)). However, various sections of the Act permit a trial court to order one party to contribute to the other party's reasonable attorney fees in light of the parties' respective financial positions. See 750 ILCS 5/503(j) (West 2018), 5/508 (West 2016). To obtain attorney fees under the Act, the party seeking them must establish his or her inability to pay the fees and the other spouse's ability to do so. *In re Marriage of Heroy*, 2017 IL 120205, ¶¶ 15-19. Nothing in section 501 or any other section of the Act, however, requires a court to "equalize" attorney fees between the parties. *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 60.

¶ 122    Preliminarily, we again observe that Carey has cited to only one case, *In re Marriage of Patel and Sines-Patel*, 2013 IL App (1st) 112571, mainly for the general proposition that the seeking spouse must establish inability to pay. Thus, Carey's fee argument, like many of her others here on appeal, runs afoul of Rule 341(h)(7). Regardless, the trial court's decision is amply supported.

¶ 123    In its order addressing Carey's fee petition, the court made the following findings. Carey was employed as a part-time baby-sitter. However, the court considered her to be "voluntarily

underemployed," as it believed that she could have been earning around $84,860 if she worked full-time and utilized her dental hygienist and certified nurse's assistant licenses, citing a 2022 statistic from the United States Bureau of Labor.[18] The court further found that she lived with her mother at virtually no cost, received government benefits from the Supplemental Nutrition Assistance Program (SNAP), and had a pending Social Security disability claim, though we observe that it was also her testimony that the claim may have been denied. Regarding Carey's previous payments to her attorney, the court observed that she had already paid her current counsel $14,277.14 as of November 3, 2022, which apparently had been provided via loan by her mother. However, the court noted, Carey had provided no evidence to substantiate that. Additionally, the court asserted that Carey's bankruptcy filing "raise[d] suspicion regarding her overall financial position or resources," given that it appeared that Carey had been discharged of most, if not all, of her financial obligations. However, the court reiterated that it did not have the full picture of Carey's finances given her failure to file a response to Eric's petition and comply with discovery.

¶ 124 In comparison, when examining Eric's financial status, the court observed that Eric retained full-time employment as an electrician and earned around $87,000 annually. The court reasoned that this level of income was "nearly equivalent" to what Carey could have made if she fully utilized her training and worked full-time. The court also noted that it was both parties' testimony that Eric had been the primary breadwinner and that the two had kept separate finances, and that Eric had been fully responsible for A.L. since separation. Finally, with regard to Eric's

---

[18]Carey challenged the trial court's imputation of income to her in her section of her brief concerning maintenance determinations. We acknowledge that the portion of the Act concerning the propriety of attorney fees overlaps with considerations used to assess whether maintenance is appropriate. See 750 ILCS § 5/503(j)(2) (West 2020). However, because Carey has forfeited that argument, we presume, without deciding, that the court's imputation was correct.

legal fees, the court found that Eric had paid his attorney $20,000, and still owed $2,000 as of the November 3, 2022, trial date.

¶ 125   On balance, the court stated that although it had been given a more complete picture of Eric's finances, it was unable to do so with Carey given her conduct and "unclean hands" throughout the litigation. As such, the court found that there was insufficient evidence to show that she was unable to pay her remaining fees of less than $2,000. If anything, the court observed, Carey's recent bankruptcy discharge "potentially [left] her in a better financial position than Eric," who had incurred significant costs in the case due to Carey's dilatory litigation strategy.

¶ 126   Carey's failure to meet her burden on her fee contribution request was due to her own actions stemming from her failure to engage in the discovery process. After reviewing the record, we again do not find that the court abused its discretion in denying Carey's petition for contribution.

¶ 127   In sum, we reiterate that much of our order today has largely been premised on Carey's failure to participate in her own case at both the trial and appellate court levels, which in turn has resulted in a lack of evidence to sustain her claims. We do not take lightly the effect of the sanction on the outcomes at trial. However, one of the purposes of the dissolution statute is to effectuate cooperation and good faith effort by the parties, which was not shown here. For the reasons stated, we affirm the trial court's orders in their entirety.

¶ 128                                      III. CONCLUSION

¶ 129   For the reasons stated, we affirm the judgment of the circuit court.

¶ 130   Affirmed.