2026 IL App (1st) 251312-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
March 9, 2026

No. 1-25-1312

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re the Marriage of* | ) | Appeal from the |
| | ) | Circuit Court of |
| YASEMIN KARAKOC, | ) | Cook County |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 24 D 7722 and |
| and | ) | 24 OP 78719 (cons.) |
| | ) | |
| SERKAN KARAKOC, | ) | The Honorable |
| | ) | Andrea Webber, |
| Respondent-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirms the trial court's entry of a plenary order of protection in favor of petitioner and against respondent.

¶ 2   The respondent, Serkan Karakoc, appeals from the trial court's order entering a plenary order of protection in favor of the petitioner, Yasemin Karakoc, and against respondent. For the reasons that follow, we affirm the order of the trial court.

¶ 3                                             BACKGROUND

¶ 4   The record in this case reflects that petitioner and respondent were married on July 27, 2019,

in Istanbul, Turkey. Proceedings for the dissolution of their marriage have been pending since October 16, 2024. The parties have one daughter, who was two years old at the time of the September 2024 events giving rise to this appeal. Petitioner's mother, Seher Kandemer, had at that time come from Turkey and for the preceding three months been staying with the parties at their apartment in Chicago.

¶ 5        It is undisputed that the presence of petitioner's mother in the parties' residence was a source of tension between petitioner and respondent. On September 11, 2024, petitioner filed the instant petition for an order of protection on behalf of herself and the parties' daughter. In it, she alleged that when she arrived home from work on September 10, 2024, respondent had met her outside and threatened to hit her and to kill both her and her mother. Petitioner also alleged that on September 3, 2024, respondent had grabbed her arm roughly and threatened to kill her following an incident involving a clogged toilet. The trial court granted an emergency order of protection.

¶ 6        Separately, on September 12, 2024, respondent filed a petition for an order of protection on behalf of himself and the parties' daughter against petitioner's mother. In it, respondent alleged that on September 10, 2024, he worked from home and observed petitioner's mother shouting at their daughter all day and behaving badly. He alleged that petitioner's mother suffered from mental illness and that the parties' daughter's safety was at risk when in her care. That petition by respondent is not a subject of this appeal. However, the two petitions for order of protection were the subject of a consolidated plenary hearing in the domestic relations division of the circuit court on January 27, 2025, and March 10, 2025.

¶ 7        Petitioner testified at the plenary hearing that on September 10, 2024, she left work to drive home around 3 p.m. She received several texts from respondent around that same time complaining about her mother's behavior toward their daughter. Petitioner arrived and parked outside the

parties' residence at about 3:15 p.m., with the expectation that her mother and daughter would meet her outside for the purpose of going to visit a prospective daycare. Instead, however, respondent came outside and approached her vehicle in an aggressive way. Respondent appeared angry and made two statements that he would kill petitioner. Petitioner testified that she became fearful and closed her car window because respondent almost hit her, raising his arm with a closed fist in an angry manner. Petitioner testified that she started to drive away, and respondent punched the roof of her car. Respondent then called petitioner's cell phone and told her to come back or he would kill her and her mother. Petitioner said nothing in response, and instead she hung up. She called the police, returned home, and waited in her car for the police to arrive.

¶ 8   She testified that before the police arrived, respondent opened a window and yelled to her to come upstairs or he would throw her mother out of the window. Petitioner's mother then opened up a different window and asked petitioner to "come upstairs, or he will kill us." Petitioner decided to go upstairs without waiting for the police. When she entered the apartment, she noticed that her mother's belongings had been strewn all over the stairs. Six photographs were admitted into evidence depicting this. Petitioner told respondent to come down and give their daughter to her so they could leave. Respondent would not do this, and instead he "took my daughter and threw her into the room." He was pulling her daughter, and her daughter was screaming and crying. Respondent closed the door. The police then arrived and respondent was arrested. Petitioner remained in the apartment that evening, and respondent did not. The following day, petitioner filed for and obtained the emergency order of protection.

¶ 9   Petitioner also testified to the events of September 3, 2024. At about 7:45 a.m., respondent asked her to come into the bathroom. In an aggressive and yelling way, he asked her why the toilet was clogged. Petitioner said she did not know, and respondent grabbed the upper part of her left

arm with his hand, pushed her out of the bathroom, and said, "I tried hard not to kill you yet."

¶ 10    Petitioner testified that she is fearful for her safety and that respondent will continue to harass or strike her if he continues to reside in the parties' residence. She testified that respondent had not physically struck her during the two-period interval ending September 10, 2024. However, she testified that he has threatened her many times over the previous two years. His threats were "[t]o kill me, to f*** me, to s*** into my mouth. He was using such words to me." She feels scared, abused, humiliated, and dishonored all the time because of respondent's conduct.

¶ 11    On cross-examination, petitioner was asked about the series of text messages that she and respondent exchanged between 3:18 p.m. and 3:33 p.m. on September 10, 2024. The text messages were in Turkish and translated by petitioner. The first three reflected in summary that respondent was complaining that petitioner's mother was mistreating the parties' daughter, and he was urging petitioner to quickly find a daycare so that petitioner's mother would no longer be responsible for their daughter's care. He wrote, "The worse [*sic*] day care is better than my mom." At 3:27 p.m., respondent sent her a text message that was a photograph of a plane ticket that he had purchased to send her mother back to Turkey. At 3:30 p.m., respondent sent a text that stated, "I'm about to open the door and s*** your mom['s] mouth as she is screaming" at their daughter. The summary of petitioner's texts in response was that respondent was also guilty of yelling at their daughter and that it was not his decision when her mother would return to Turkey.

¶ 12    Petitioner was also shown on cross-examination several video clips taken from Blink security system cameras that the parties had installed throughout the interior of their apartment. The general purpose of this line of questioning was impeachment by omission that these video clips did not show certain arguments, threats of killing, and conduct of yelling through windows that petitioner asserted had occurred that day. However, the trial court noted during the playing of the videos that

they showed respondent yelling with the child in the room.

¶ 13    The trial court adjourned the proceedings of January 27, 2025, prior to the conclusion of petitioner's cross-examination. The hearing was continued to March 10, 2025. However, the report of proceedings from March 10, 2025, begins with the statement, "Proceedings were had that were not included in this recording. This is a recorded proceeding already in progress." The transcript begins with the trial court overruling an unspecified objection during respondent's direct examination by his own attorney. We are unable to ascertain whether there was additional cross-examination of petitioner, any redirect examination, or the extent of respondent's testimony on direct examination prior to the commencement of transcription.

¶ 14    The transcribed portion of respondent's testimony begins with the publishing of approximately seven video clips taken inside the parties' apartment by the Blink cameras on September 10, 2024. Respondent testified that these video clips showed that he was speaking respectfully to petitioner's mother in telling her to pack her belongings and leave. He testified that petitioner's mother was the only person screaming and shouting, and he had taken his daughter into a different room for her protection. He testified that he never went to a window to yell to petitioner to come upstairs or he would kill her. Likewise, he testified that petitioner's mother never went to a window to scream for help. He testified that another video taken inside the apartment after he was arrested showed that petitioner's mother had asked petitioner if she and respondent had been fighting; petitioner answered that yes, she had fought with respondent after he sent her text messages when she was on her way home. Petitioner's counsel stipulated that petitioner's mother looked surprised at this information.

¶ 15    Respondent also played several video clips from the cameras inside the apartment on September 3, 2024. He testified that these showed that he and petitioner had only a regular and

calm conversation that morning prior to his leaving for work. He testified that he never harmed petitioner by squeezing her arm in the bathroom.

¶ 16     Respondent testified that on the evening of September 9, 2024, he and petitioner had a conversation in which he said to her, " 'You need to make a choice between your mother and me because I am done with all these happenings.' " He repeatedly threatened to divorce petitioner if things did not change with her mother. He testified that petitioner responded to this by threatening that he would not get parenting time with their daughter if he pursued a divorce.

¶ 17     The following day, he worked from home because he had a medical appointment. He heard petitioner's mother screaming at their daughter, and he sent a text message to petitioner that her mother needed to stop mistreating their daughter. He urged petitioner to get daycare arrangements in order, but petitioner was refusing to do this. He also booked a plane ticket for her mother to return home on October 2, 2024. Petitioner's response when respondent told her he had done this was to say that he was not the one to obtain her mother's flight ticket. Respondent was also shown the photographs in evidence of petitioner's mother's belongings strewn on the stairs, and he was asked why he had done this. He answered, "I wanted she [*sic*] leave the home, but she was screaming saying she is not going to leave the home." When petitioner arrived home from work that day, he saw from the window that she was in her parked car. After her last text message, he tried calling her, but she did not answer. He then went downstairs to talk to her, but they did not have any communication. Instead, petitioner immediately ran her car toward him in an attempt to hit him. He testified that he told this to the police when they arrived. Asked if he ever threatened to hit her downstairs, he answered, "She did not stay even there. She just try to run her car toward me and hit me. And then she left." He testified petitioner never came upstairs during these events. He was shown the police body camera footage from 3:46 p.m. on September 10, 2024, and testified

that it showed that he and petitioner were outside of the building.

¶ 18        On cross-examination, respondent acknowledged that no video clips showed the timeframe between 3:36 p.m. and 3:40 p.m. on September 10, 2024. He also acknowledged there was a three-minute gap between the fourth and fifth clips and a five-minute gap between the sixth and seventh clips, during which time nothing was recorded. Respondent also testified that when he approached petitioner's car on the street, he was on the driver's side. There was no redirect examination by respondent's counsel.

¶ 19        The final witness to testify at the plenary hearing was petitioner's mother. She was called as a witness by respondent and testified remotely. She denied that she had yelled at her granddaughter at around 3:30 p.m. on September 10, 2024, but she was impeached by a Blink camera video clip that showed her yelling at the child at that time. She testified that she was now living in Turkey and had no present intention to return to the United States.

¶ 20        After closing argument, the trial court ruled that a plenary order of protection was entered in favor of petitioner and against respondent, to expire on August 10, 2026. In so ruling, the trial court stated that it found that petitioner had testified credibly about respondent's actions on September 10, 2024. The trial court stated that it found the police body camera footage supported petitioner's version of events because it demonstrated how upset respondent appeared and showed clothes thrown down the stairs. The trial court also stated that video showed that respondent never denied to police the allegations made against him except for one issue with the car. The trial court also referenced in its ruling that the video clips from inside the apartment showed how extremely frustrated and upset respondent was that day. The trial court stated that it recognized respondent's frustration stemmed from problems with petitioner's mother, but it added that "the reason for behavior is not necessarily relevant in an order of protection hearing."

¶ 21 However, the trial court denied the aspect of petitioner's petition that sought to treat the parties' daughter as a protected party. It also denied respondent's petition for an order of protection against petitioner's mother. The trial court stated that it did not find petitioner's mother to have been a credible witness because she was impeached with the video evidence. But it found no conduct by her amounting to abuse and no risk of future abuse because she was living in Turkey. Despite this finding, the trial court ordered *sua sponte* that the parties' daughter may not be left alone with petitioner's mother until further order of court.

¶ 22 On April 3, 2025, respondent filed a motion to reconsider or vacate the plenary order of protection. In summary, the basis of respondent's argument was that the trial court's finding that petitioner gave credible testimony was unsupported with the evidence, because every essential allegation in her petition was contradicted by the Blink camera footage, the police body camera footage, and text messages that the parties exchanged in real time. Respondent also argued there had been no evidence presented of any threats or abuse. The motion was fully briefed, and the trial court held oral argument on June 9, 2025. The trial court denied the motion to reconsider. In doing so, it reiterated that it had found petitioner credible and accepted her story. It acknowledged that there were minor inconsistencies in her testimony, but it found these explained by the stress of the situation, which it found evident from the video evidence introduced by respondent. The trial court stated that the videos did not contradict petitioner's testimony but rather corroborated it.

¶ 23 Respondent thereafter field a timely notice appeal, which identified the order being appealed as that of June 9, 2025, denying the motion for reconsideration. The underlying order of March 10, 2025, was not mentioned in respondent's notice of appeal.

¶ 24 ANALYSIS

¶ 25 We begin our analysis with petitioner's challenge to our jurisdiction to consider the issues

raised by respondent in this court. According to petitioner, this court lacks jurisdiction over the issues raised because respondent's notice of appeal designates only the order of June 9, 2025, involving the denial of respondent's motion to reconsider the plenary order of protection, as the order he intended to appeal. Petitioner argues that the failure to specify the underlying order of March 10, 2025, in the notice of appeal deprives this court of jurisdiction to review the issues resolved by that order. Petitioner emphasizes that the ruling on the plenary order of protection was a final order. See *Scheider v. Ackerman*, 369 Ill. App. 3d 943, 945 (2006). Petitioner contends that the finality of this order prohibits us from reaching respondent's arguments simply by applying the principle that an appeal from a final judgment draws into issue all previous interlocutory orders that produced the final judgment. See *In re Marriage of Lugo*, 2025 IL App (1st) 231478, ¶ 67.

¶ 26    We reject petitioner's argument that we lack jurisdiction to reach the issues presented in respondent's appeal. In most cases, this court takes the view that a notice of appeal designating a judgment resolving a motion to reconsider is sufficient to confer jurisdiction also over the underlying judgment as to which reconsideration was sought. *In re Marriage of Ruvola*, 2017 IL App (2d) 160737, ¶ 51; accord *Schmidt v. Joseph*, 315 Ill. App. 3d 77, 80 (2000); *Heller Financial, Inc. v. Johns-Byrne Co.*, 264 Ill. App. 3d 681, 689 (1994); *Pickle v. Curns*, 106 Ill. App. 3d 734, 737 (1982). This practical approach reflects the fact that an appellee generally receives fair notice that an appellant's intent is to appeal issues stemming from an underlying order even if the notice of appeal mentions only the trial court's ruling upon reconsideration of that underlying order. Absent some showing of prejudice, we apply a liberal construction when determining what issues are properly raised by a notice of appeal, and we prefer to allow the parties' briefs, not the notice of appeal, to define the precise grounds relied upon for reversal. See *Heller Financial*, 264 Ill. App. 3d at 689.

¶ 27　　In this case, there is no suggestion by petitioner that she has suffered any prejudice in defending the trial court's underlying ruling entering the plenary order of protection in her favor, even though respondent's notice of appeal mentioned only the order denying reconsideration of that ruling. As such, we liberally construe respondent's notice of appeal and hold that it is fully adequate to confer jurisdiction upon this court to review the issues raised by respondent that were resolved by entry of the underlying plenary order of protection on March 10, 2025.

¶ 28　　Turning to the merits, respondent urges this court to vacate and reverse the plenary order of protection entered by the trial court in favor of petitioner on March 10, 2025. Respondent raises two principal arguments for reversal. First, respondent argues that as a matter of law, no conduct by him toward petitioner constituted "abuse" for purposes of the Illinois Domestic Violence Act of 1986 (750 ILCS 60/101 *et seq.* (West 2024)). Second, he argues that the trial court's finding of "abuse" was against the manifest weight of the evidence or, in the alternative, constituted an abuse of discretion. We find that the points relied upon by respondent in support of these arguments are highly overlapping and that these two arguments therefore can be addressed together.

¶ 29　　As this case involves a proceeding to obtain an order of protection, the central inquiry is whether the petitioner has been abused. *Best v. Best*, 223 Ill. 2d 342, 348 (2006). Under section 214(a) of the Domestic Violence Act (750 ILCS 60/214(a) (West 2024)), if the trial court finds that the petitioner has been abused by a family or household member, an order of protection "shall issue." Whether a petitioner has been abused is an issue of fact that must be proven by a preponderance of the evidence. *Best*, 223 Ill. 2d at 348. The appellate court will reverse such a finding only if it is against the manifest weight of the evidence. *Id.* at 348-49. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *Id.* at 350. Under

the manifest weight standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses. *Id.* We will not substitute our judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn. *Id.* at 350-51.

¶ 30      For purposes of the Domestic Violence Act, "abuse" is defined by statute as meaning, among other things, "physical abuse" and "harassment," but it "does not include reasonable direction of a minor child by a parent." 750 ILCS 60/103(1) (West 2024). In turn, "physical abuse" is defined by statute to include, among other things, "knowing or reckless use of physical force, confinement or restraint" as well as "knowing or reckless conduct which creates an immediate risk of physical harm." *Id.* § 103(14)(i), (iii). "Harassment" is defined as "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." *Id.* § 103(7). Unless rebutted by a preponderance of the evidence, certain types of specified conduct are presumed to cause emotional distress, one of which is "threatening physical force, confinement or restraint on one or more occasions." *Id.* § 103(7)(vi).

¶ 31      As stated above, respondent's arguments are that no conduct by him toward petitioner shown by the evidence to have occurred constituted "abuse" within the above statutory definitions and that the trial court's finding such "abuse" occurred was against the manifest weight of the evidence, or alternatively was an abuse of discretion. In making these arguments, respondent's position is that the undisputed evidence showed that his conduct consisted entirely of (1) expressing concern over petitioner's mother's verbal mistreatment of the parties' two-year-old daughter; (2) asking petitioner's mother to leave the home; and (3) communicating with petitioner through text messages about arranging daycare and returning her mother to Turkey. He argues that none of his

actions were shown by the evidence to have been directed at petitioner; instead, he contends, the only problematic or dangerous conduct shown by the evidence to have occurred was by petitioner's mother. He contends that the trial court improperly used his responses to petitioner's mother's provoking behavior—his frustration toward her, his telling her to leave the home, and his strewing of her clothing down the stairs—to support entry of a plenary order of protection against petitioner, who was not the person at whom respondent's conduct was directed. He adds that his actions toward petitioner's mother were done only for the necessary reason of protecting his daughter from her mistreatment, and he asserts that his actions amounted to the reasonable direction of a minor child expressly excluded from the statutory definition of "abuse." He emphasizes the trial court's finding that petitioner's mother was not a credible witness and its *sua sponte* order that she never be left alone with the child. He argues that his efforts to address petitioner's mother's mistreatment of the parties' daughter cannot constitute abuse toward petitioner.

¶ 32     We reject respondent's argument that no conduct by him constituting abuse toward petitioner was shown by the evidence at the plenary hearing. In our view, the argument made by respondent above simply fails to acknowledge petitioner's testimony as to at least two specific incidents in which respondent made multiple threats to kill petitioner, raised his arm with a closed fist in a threat to hit her while she was in her car, and grabbed her by the upper arm and pushed her out of the bathroom following a problem with a clogged toilet. This conduct by respondent toward petitioner clearly qualifies as "abuse" within the statutory definitions set forth above, inasmuch as this conduct involved the use of physical force, created risk of imminent physical harm, or amounted to an unreasonable and unnecessary threat to use physical force on more than one occasion. The trial court found petitioner's testimony to be credible, despite acknowledging minor inconsistencies in it. The trial court also found her testimony to be corroborated by the video

evidence that showed how angry respondent was during the events of September 10, 2024, and that he had strewn her mother's belongings down the stairs of the apartment. These determinations concerning the credibility of witnesses, the weight to be given various evidence, and the inferences to be drawn from the evidence were entirely the purview of the trial court, and this court will not substitute our judgment for that of the trial court on these matters. *Best*, 223 Ill. 2d at 350-51. Under the manifest weight standard of review, the trial court's judgment will be affirmed if the record contains any evidence to support it. *In re Estate of Wilson*, 238 Ill. 2d 519, 570 (2010). Accordingly, petitioner's testimony about respondent's conduct toward her sufficiently supports the trial court's judgment that she was abused and thus a plenary order of protection shall issue.

¶ 33    Respondent's only attempt to address petitioner's testimony as to the above facts is to argue that it was entirely contradicted by the "objective" evidence, by which he means the parties' text messages exchanged in real time, the Blink camera footage from inside the parties' apartment, and the police body camera footage. Respondent argues that the trial court improperly disregarded this "objective" evidence and instead relied upon isolated portions of petitioner's testimony. In support of this argument, he contends that none of the video footage introduced at the evidentiary hearing shows him threatening, harming, or attempting to intimidate petitioner. He contends that none of the text messages exchanged that afternoon contain threatening language toward petitioner. He contends that the video evidence contradicts petitioner's testimony about respondent or petitioner's mother going to the window and yelling about threats to kill petitioner if she did not come inside. He contends that the video evidence shows petitioner in fact never came inside the apartment until the police arrived. He also contends that the police body camera footage showed no report of danger at the scene, that all parties were acting calmly, and that he did in fact deny the allegations that petitioner made against him to the police. He contends that the most probative evidence is the

Blink camera footage from inside the apartment after he was arrested, wherein petitioner's mother asked petitioner if she and respondent had an argument that day. Petitioner answered yes, that he sent her a text on her way home, but that they should not talk about it where they were. Respondent contends that if the events of the afternoon had unfolded as petitioner testified, then her mother would not have been confused about what had just occurred, and petitioner would not have described it as merely an argument. Respondent contends that nothing in this video clip reflects the danger, fear, abuse, or conduct matching petitioner's testimony.

¶ 34       These arguments by respondent fail for several reasons. Primarily, they are simply arguments that the trial court gave improper weight to the video evidence and the text messages or that the inferences the trial court drew from this evidence (*i.e.*, that the contents of the videos corroborated petitioner's testimony) were not warranted. Under the manifest weight standard of review, these are the kinds of determinations for the trial court to make about which we will not substitute our judgment. *Best*, 223 Ill. 2d at 350-51. Furthermore, there is no suggestion that any camera captured the primary interaction wherein respondent went outside and confronted petitioner in her car, an event that respondent acknowledged in his testimony occurred. Thus, all of the video evidence in this case, inasmuch as it shows the parties' demeanor and other concurrent conduct, is largely circumstantial evidence bearing upon the parties' credibility as to whether respondent made threats to hit or kill petitioner during this primary interaction at the car. Such determinations involving witness credibility are of course decisions for the trial court to make. *Id.*

¶ 35       Moreover, even if it were appropriate in this circumstance for the appellate court to draw our own conclusions after viewing the video evidence, respondent has failed to include any of the video evidence within the certified record on appeal. Instead, respondent has merely included hyperlinks in his appellant's brief to a Google Drive account that apparently hosts the video clips

upon which he relies. Respondent's citations by use of these hyperlinks in his brief have no corresponding citations to any exhibit that is part of the certified record on appeal. Although it appears from the transcript of the plenary hearing that the trial court admitted at least some of the video clips used by respondent into evidence, no video exhibits are included within the certified record on appeal that was submitted to this court.

¶ 36     The rule is well established that the appellate court may not consider documents or other materials of an evidentiary nature that are not part of the certified record on appeal. *Hartz Construction Co. v. Village of Western Springs*, 2012 IL App (1st) 103108, ¶ 50. Including evidence in an appellate brief that is not contained in the certified record on appeal is not a proper means of supplementing the record or of placing such evidence before the appellate court. *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 392 Ill. App. 3d 1, 14 (2009). While it is the responsibility of the clerk of the trial court to prepare and certify the record on appeal (see Ill. S. Ct. R. 324 (eff. July 1, 2017)), it is the appellant's burden to ensure that any exhibits that will be used to support a claim of error on appeal are filed with or otherwise transmitted to the clerk for inclusion in the certified record. See *In re K.S.*, 317 Ill. App. 3d 830, 832 (2000). This includes exhibits that constitute digitally stored evidence, such as video recordings. One of the requirements of Illinois Supreme Court Rule 324 (eff. July 1, 2017) is that the record on appeal comply with the "Standards and Requirements for Electronic Filing the Record on Appeal" adopted by the Illinois Supreme Court (hereinafter "Standards and Requirements"). The version of the Standards and Requirements that was effective at the time the record on appeal and appellant's opening brief were filed in this case provided, "Electronic media exhibits, including but not limited to video and audio recordings, all computer media, discs, flash drives, etc., shall be mailed or delivered in original form to the reviewing court." Supreme Court

of Illinois, *Standards and Requirements for Electronic Filing the Record on Appeal*, § 3(d)(v) (rev. Jan. 1, 2021). It also stated, "Any external material hyperlinked in any document within the Record on Appeal is not considered part of the document or the Record on Appeal." *Id.* § 3(a)(3).

¶ 37   In this case, respondent has failed to follow the necessary requirements for including the video clips that he used as exhibits at the plenary hearing within the certified record on appeal. The hyperlinks in his appellate brief to a Google Drive that he hosts is not an adequate substitute for citation to a certified record on appeal containing these exhibits. With a record on appeal that has been certified by the clerk of the trial court, we generally have assurance that the evidence we are reviewing is the same as was used in the trial court and admitted into evidence. With a hyperlink to an outside website, we lack this same assurance. We are further reluctant to click on hyperlinks to unknown websites as a matter of computer security and to avoid the risk of any inadvertent *ex parte* communication that might result from accessing evidence on a website hosted by one of the parties to an appeal. For these reasons, among others, it is necessary that parties follow the proper and established procedures for placing digitally stored evidence into the record on appeal for review by this court. Respondent's failure to do so in this case results in our disregarding of any video evidence upon which his argument relies. *Keener v. City of Herrin*, 235 Ill. 2d 338, 346 (2009).

¶ 38   Respondent also contends that the trial court erred by finding "abuse" without considering the context of the parties' relationship, the circumstances surrounding the alleged conduct, the parties' history, their motives, and all relevant evidence including the video recordings and electronic communications. The basis for this argument by respondent was the trial court's statement upon ruling that it did not understand why respondent had focused so extensively upon his being upset with petitioner's mother "because the reason for behavior is not necessarily

relevant in an order of protection proceeding." Respondent asserts that this statement indicates that the trial court declined to consider that the context of his statements and actions were directed at the conduct by petitioner's mother toward the parties' daughter rather than at petitioner.

¶ 39    We reject the argument by respondent that this statement by the trial court indicates that it engaged in any faulty legal analysis or that it failed to consider certain evidence. It is clear from our review of the transcript that the trial court understood that the presence of petitioner's mother in the residence and her conduct toward the parties' daughter was the key source of conflict between petitioner and respondent. It is further clear from the transcript that the trial court considered the videos and text messages as part of its ruling, although its view was that the videos corroborated petitioner's testimony that respondent had abused her. As discussed above, the trial court's finding that petitioner was abused by respondent was supported by the evidence and not against its manifest weight. We interpret the trial court's comment above not to reflect any misapplication of the law or refusal to consider evidence, but instead the trial court was simply recognizing that, regardless of the reason why abuse had occurred, issuance of an order of protection was mandatory under the statute if the court found that petitioner had been abused. See 750 ILCS 60/214(a) (West 2024) (if the court finds that petitioner has been abused, "an order of protection *** shall issue"); *Sanchez v. Torres*, 2016 IL App (1st) 151189, ¶ 22 (" '[S]hall issue' is a mandatory term requiring the trial court to enter an order of protection").

¶ 40    Finally, respondent raises an argument in the alternative that the trial court's ruling constituted an abuse of discretion for largely the same reasons that we have addressed above. However, we need not address this argument because our supreme court has expressly held that manifest weight of the evidence, not abuse of discretion, is the proper standard for reviewing a trial court's finding of abuse under the Domestic Violence Act. *Best*, 223 Ill. 2d at 350.

¶ 41                                                   CONCLUSION

¶ 42        For the foregoing reasons, the plenary order of protection entered by the trial court in favor

of petitioner and against respondent is affirmed.

¶ 43        Affirmed.